# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

LONDELL DAVENPORT,
       *Plaintiff*,

              v.                                          No. 3:18-cv-1641 (VAB)

ANDREW SAUL,
*Commissioner of Social Security*,
              *Defendant*.

## RULING AND ORDER ON MOTION FOR JUDGMENT ON THE PLEADINGS AND MOTION TO AFFIRM THE DECISION OF THE COMMISSIONER

Londell Davenport ("Plaintiff") filed this administrative appeal under 42 U.S.C. § 405(g) against Andrew Saul,[1] the Commissioner of Social Security ("Defendant" or "the Commissioner"), seeking to reverse the decision of the Social Security Administration ("SSA") denying his claim for Title XVI supplemental security income under the Social Security Act. Compl., ECF No. 1 (Oct. 10, 2018).

Mr. Davenport has moved for an order reversing the decision of the Commissioner. Mot. for Order, ECF No. 19 (Mar. 8, 2019) ("Pl.'s Mot. to Reverse"); Mem. in Supp. of Pl.'s Mot., ECF No. 19-1 (Mar. 8, 2019) ("Pl.'s Mem.").

The Commissioner has moved for an order affirming his decision. Mot. for an Order Affirming the Decision of the Commissioner, ECF No. 23 (May 7, 2019) ("Gov't Mot. to

---

[1] When a party in an official capacity resigns or otherwise ceases to hold office while the action is pending, the officer's successor is automatically substituted as a party, regardless of the party's failure to so move or to amend the caption; the Court may also order such substitution at any time. Fed. R. Civ. P. 25(d); *see also Williams v. Annucci*, 895 F.3d 180, 187 (2d Cir. 2018); *Tanvir v. Tanzin*, 894 F.3d 449, 459 n.7 (2d Cir. 2018). The Clerk of Court therefore will be ordered to change the defendant of the case from Ms. Berryhill to Mr. Saul. *See* Social Security Administration, *Andrew Saul: Commissioner*, https://www.ssa.gov/agency/commissioner.html (last visited Mar. 31, 2020) ("Andrew Saul was sworn in as Commissioner of Social Security on June 17, 2019, for a six-year term that expires on January 19, 2025.").

Affirm"); Statement of Facts, ECF No. 23-1 (May 7, 2019) ("Gov't SOMF"); Mem. in Supp. of

Mot. for an Order Affirming the Commissioner's Decision, ECF No. 23-2 (May 7, 2019) ("Gov't

Mem.").

For the reasons explained below, Mr. Davenport's motion is **GRANTED in part and**

**DENIED in part**.

His motion is granted with respect to the Commissioner's determination at Step Three of

his eligibility under Listing 11.04, 12.02, 12.04, and 12.06, but denied with respect to the

determination of his eligibility under Listing 1.04; granted with respect to the determination at

Step Four regarding Mr. Davenport's residual functional capacity; and granted with respect to

the Commissioner's determination at Step Five.

Accordingly, consistent with this ruling, the Commissioner's motion also is **GRANTED**

**in part and DENIED in part.**

The decision of the Commissioner therefore is **VACATED** and **REMANDED** for

rehearing and further proceedings in accordance with this Ruling and Order.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

### A.        Factual Allegations[2]

---

[2] As explained below, the parties did not confer to file a Stipulation of Facts as required by the Standing Scheduling Order in this case. Instead, Mr. Davenport filed a memorandum in support of his motion to reverse the decision of the Commissioner which included a 41-page facts section with unnumbered paragraphs, using language apparently directly from medical notes and reports without quotation marks, rather than presenting a narrative of the facts. Pl.'s Mem. (for example, at 3: "I suspect the patient is likely experiencing a migraine, which was more than likely precipitated by his muscle spasm in his neck. (R. at 316). ADDENDUM: he is feeling better, although he complains he continues to have left-sided neck pain, 'in the muscles', the patient also complains that when he stands up he feels 'dizzy'. I'll give the patient a dose of Motrin now, as well as a dose of Antivert."). At the same time, Plaintiff filed a motion for waiver of the Standing Scheduling Order's 40-page limitation on memoranda. Pl.'s Mot. for Waiver of Page Limitation, ECF No. 20 (Mar. 8, 2019).

The Commissioner asked the Court to deny Plaintiff's motion and to require Plaintiff to refile following either the Court's Standing Scheduling Order in this case or a more recent standing scheduling order in the District of Connecticut which has been posted in other social security cases, but has not been posted here. Gov't Mem. in Opp'n to Pl.'s Mot. for Waiver, ECF No. 21 (Mar. 13, 2019) ("Gov't Opp'n to Waiver of Page Limit"); *see* District of Connecticut Standing Scheduling Order—Social Security Cases ("Revised Standing Scheduling Order") (Nov.

Mr. Davenport was born in 1976. Although various parts of the record state that Mr. Davenport completed high school, Mr. Davenport reported at his Social Security Administration hearing that he was expelled from the tenth grade and never obtained a high school equivalency degree. *See* Transcript of Administrative Proceedings 61–63, ECF No. 16 (Dec. 18, 2018) ("Tr.") (Soc. Sec. Hearing Tr. at 14 (Nov. 29, 2017) ("SSA Tr.")). Mr. Davenport did complete his certified nursing assistant degree (CNA)[3] in 2008. *Id.* at 63. He did not, however, ever work as a CNA. *Id.* at 87–88.

For about eighteen months between 2009 and 2010, Mr. Davenport worked at Burlington Coat Factory. *Id.* at 64–65. Mr. Davenport worked as a barber from 2008 until November 2015. *Id.* at 65.

The Administrative Law Judge ("ALJ") found Mr. Davenport to have the following severe impairments: "cerebral vascular accident, spine disorder, organic brain syndrome, depressive disorder, and anxiety disorder." Tr. 30 (Soc. Sec. Admin. Decision at 3).

---

15, 2018), http://www.ctd.uscourts.gov/sites/default/files/general-ordes/18-26_Standing%20Scheduling%20Order-%20Social%20Security%20Cases_0.pdf ("Plaintiff shall file, as a separate document, a Statement of Material Facts consisting of numbered paragraphs and supported by specific page citations to the Certified Administrative Record. The statement must reference facts in the [ ] Record as opposed to conclusions of law. The Statement shall not exceed 20 pages. . . . Within 60 days after Plaintiff files the Statement of Material Facts, the Defendant shall file a responsive statement of facts that corresponds to Plaintiff's Statement of Material Facts and indicate if the Defendant adopts the contents of each paragraph as presented. . . . The Statement shall not exceed 20 pages.").

The Court did not rule on these motions, and the Commissioner subsequently filed her own Responsive Statement of Facts, stating that "Defendant generally agrees to Plaintiff's recitation of the facts, but objects to any argumentative or subjective statements," and that "Defendant submits the following supplemental facts and/or clarifications." Gov't SOMF at 3. The Court's facts section here thus consists of facts upon which the parties appear to agree, based on both parties' filings and the record, except where judicial notice is taken. *See* Fed. R. Evid. 201(b) ("The court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot be reasonably questioned.").

[3] *See Isureal v. Colvin*, No. 3:15-cv-221 (JGM), 2017 WL 9730203, at *2 (D. Conn. May 31, 2017), *report and recommendation adopted sub nom. Isureal v. Berryhill*, No. 3:15-cv-00221 (JAM), 2018 WL 1409797 (D. Conn. Mar. 21, 2018) (noting that "CNA" stands for "certified nursing assistant").

## 1. Medical History

### a. Stroke and Neurosurgery—November 2015

On November 11, 2015, at age 38, Mr. Davenport went to the emergency room at St. Francis Hospital for headaches, dizziness, and myalgias. Pl.'s Mem. at 5; Tr. 314–23 (St. Francis Hospital ED Records (Nov. 11, 2015)). Although he was initially discharged after a CAT scan of the head was returned normal, his symptoms did not improve, and he was admitted to Hartford Hospital the next day. Pl.'s Mem. at 6; Tr. 324–26 (Hartford Hospital Discharge Summary (Nov. 18, 2015)). It appeared that Mr. Davenport had had a stroke. Pl.'s Mem. at 6 ("TOAST classification with the stroke secondary to large vessel disease"); Tr. 324.

On November 14, 2015, Mr. Davenport underwent neurosurgery. Pl.'s Mem. at 7; Tr. 325 ("decompressive left occipital decompressive craniectomy procedure[4]").

On November 18, 2015, Mr. Davenport was discharged from the hospital to Chelsea Place, a skilled nursing facility. Pl.'s Mem. at 49; Tr. 477 (Hartford Hospital Discharge Report (Dec. 18, 2015)).

On December 10, 2015, Chelsea Place discharged Mr. Davenport with visiting nurse services in the home. Pl.'s Mem. at 49; Tr. 505 (Chelsea Place Discharge Planning Checklist (Dec. 10, 2015)).

On January 15, 2016, Mr. Davenport was seen for a post-hospitalization visit at Hartford Hospital. Pl.'s Mem. at 13; Tr. 356 (Gengras/Burgdorf Ambulatory Care Center Progress Notes (Jan. 15, 2016)). Mr. Davenport provided a patient discharge summary from the hospital stating that he had had a hemorrhagic stroke and listing medication. *Id.* A physician's notes stated that

---

[4] *See Craniotomy*, JOHNS HOPKINS MEDICINE, https://www.hopkinsmedicine.org/health/treatment-tests-and-therapies/craniotomy (last visited Mar. 30, 2020) (defining craniectomy as a surgical "procedure during which a portion of the skull is permanently removed or replaced later during a second surgery after [brain] swelling has gone down").

Mr. Davenport "ha[d] no residual deficit from the strokes," and that he "[d]enied changes in mentation, vision, speech, motor or sensation." Pl.'s Mem. at 14; Tr. 356.

On March 8, 2016, state consultive psychologist Philip Cardamone, PsyD, examined Mr. Davenport and administered cognitive testing upon request from Disability Determination Services. Gov't Mem. at 2; Pl.'s Mem. at 54; Tr. 359–63 (Philip S. Cardamone, Provider*Care*Plus, Confidential Psychological Consultation (Mar. 8, 2016)). Dr. Cardamone concluded that Mr. Davenport had "made substantial recovery" following his neurosurgery, "but has current problems that will probably hinder occupational functioning at this time." Tr. 362. Dr. Cardamone stated that Mr. Davenport had

> returned to work after recovery from neurosurgery but found that he could not tolerate standing. He made some mistakes and was close to losing his balance. He stopped working after a few days after the shop owner informed him that he was a liability risk. Mr. Davenport explained that he was having shoulder pain not caused by physical exertion.

Tr. 359. Dr. Cardamone also stated that Mr. Davenport was "forthright, responsive to questions, . . . alert, calm, polite, and coherent. He was well oriented." *Id.* 360. He found further that Mr. Davenport's "auditory attention and initial registration of information, as measured by digit repetition, was above average," that he showed "significant attention and concentration strengths," and that his verbal comprehension, perceptual reasoning, and working memory were average. Gov't Mem. at 2; Tr. 361.

On April 28, 2016, Mr. Davenport had "transient right sided throbbing headaches lasting 2–3 minutes with severity of 5/10 that can happen intermittently every 2–3 hours." Pl.'s Mem. at 14; Tr. 404 (Gengras/Burgdorf Ambulatory Care Center, Unspecified Notes (Apr. 28, 2016)). Medical notes state that Mr. Davenport reported "he zones out at times for no reason, he also cannot stand up too long as he falls on his left side." Pl.'s Mem. at 14; Tr. 404. The notes also

state that Mr. Davenport "ha[d] done rehabilitation post-surgery and now he can walk without a walker."

###### b. Car Accident—May 2016

On May 8, 2016, Mr. Davenport had a car accident, Pl.'s Mem. at 18, 46; Tr. 364 (Hartford Hospital Consultation Report (May 8, 2016)), and had to be admitted to Hartford Hospital for "1. Motor vehicle collision. 2. Right lung contusion. 3. Retroperitoneal hematoma. 4. Left-sided transverse process fractures . . . . Left T12 costovertebral joint disruption. 6. Right inferior sacral fracture. 7. Right medial malleolar fracture." Pl.'s Mem. at 8; Tr. 368 (Hartford Hospital Stat Transfer Summary (May 12, 2016) (listing admitting diagnoses)).

On the day of his admission, Mr. Davenport had an orthopedic consultation with Stephen Davis, MD. Pl.'s Mem. at 18; Tr. 364 ("The patient is a 39-year-old male who was an unrestrained driver in a high-speed MVA, striking a tree and then the tree falling on the car with prolonged extrication,[5] complaining of low back pain. He did have head trauma and questionable loss of consciousness. He is a poor historian."). Dr. Davis recorded that Mr. Davenport "ha[d] tenderness to palpation about the C-spine," that his "right upper extremity ha[d] pain about the right forearm," and that he had "pain about the right side." *Id.* Computed tomography ("CT")

---

[5] "Prolonged extrication" refers to the removal by emergency personnel of an individual who is trapped in a collapsed structure, such as a car. *See* Centers for Disease Control and Prevention, *Guidelines for Field Triage of Injured Patients: Recommendations of the National Expert Panel on Field Triage, 2011*, Morbidity and Mortality Weekly Report Vol. 61, No. 1 (Jan. 13, 2012), https://www.cdc.gov/mmwr/pdf/rr/rr6101.pdf (discussing prolonged extrication of patients from motor vehicle crashes); International Search and Rescue Advisory Group (INSARAG) Medical Working Group, Medical Guidance Note: The Medical Management of the Entrapped Patient with Crush Syndrome 1 (Feb. 2012), https://www.insarag.org/images/stories/Documents/Methodology/Guidance_Notes/MWG/07_MWG_The_Medical_Management_of_the_Entrapped_Patient_with_Crush_Syndrome.pdf (providing guidelines for response to a collapsed structure, including where there is "[p]rolonged extrication and evacuation of patient").

scans showed a "mildly displaced fracture of the right lower sacrum,"[6] a hematoma[7], and a "hepatic hemorrhage."[8] Pl.'s Mem. at 3; Tr. 375 (Hartford Hospital Patient Results (May 8, 2016)). CT scans also showed "opacification within the anterior right upper lobe[9]" of Mr. Davenport's lungs "consistent with pulmonary contusion in the setting of recent trauma." Tr. 376 (Hartford Hospital Patient Results (May 8, 2016)). Dr. Davis also recorded that Mr. Davenport would "likely need a [ ] brace for comfort if unable to mobilize." Pl.'s Mem. at 18; Tr. 364.

On May 9, 2016, an X-ray of Mr. Davenport's right ankle showed a "nondisplaced fracture" and "moderate ankle joint effusion." Pl.'s Mem. at 4; Tr. 389 (Hartford Hospital Patient Results (May 9, 2016)).

On May 13, 2016, Mr. Davenport was discharged in stable condition. Pl.'s Mem. at 8; Tr. 368 (Hartford Hospital Stat Transfer Summary (May 12, 2016)). His fractures were found to be nonoperative, and he was recommended to wear a brace at all times out of bed for comfort. Pl.'s

---

[6] The sacrum is the "The large, triangle-shaped bone in the lower spine that forms part of the pelvis. It is made of 5 fused bones of the spine." *Sacrum*, NCI Dictionary of Cancer Terms, NATIONAL CANCER INSTITUTE, https://www.cancer.gov/publications/dictionaries/cancer-terms/def/sacrum (last visited Mar. 30, 2020). *See also Sitts v. United States,* 811 F.2d 736, 738 (2d Cir. 1987) ("Below the lumbar vertebrae are the sacral vertebrae, . . . .").

[7] A hematoma is "[a] pool of clotted or partially clotted blood in an organ, tissue, or body space, usually caused by a broken blood vessel." *Hematoma*, NCI Dictionary of Cancer Terms, NATIONAL CANCER INSTITUTE, https://www.cancer.gov/publications/dictionaries/cancer-terms/def/hematoma (last visited Mar. 30, 2020). *See also Ingraham v. Wright*, 430 U.S. 651, 657 (1977) ("Stedman's Medical Dictionary (23d ed. 1976) defines 'hematoma' as '(a) localized mass of extravasated blood that is relatively or completely confined within an organ or tissue . . . ; the blood is usually clotted (or partly clotted), and, depending on how long it has been there, may manifest various degrees of organization and decolorization.'").

[8] "Hemorrhage" refers to "loss of blood from damaged blood vessels. A hemorrhage may be internal or external, and usually involves a lot of bleeding in a short time." *Hemorrhage*, NCI Dictionary of Cancer Terms, NATIONAL CANCER INSTITUTE, https://www.cancer.gov/publications/dictionaries/cancer-terms/def/hemorrhage (last visited Mar. 30, 2020). "Hepatic" means "of, relating to, affecting, associated with, supplying, or draining the liver." *Hepatic*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/hepatic (last visited Mar. 30, 2020).

[9] A "lobe" is a "portion of an organ, such as the liver, lung, breast, thyroid, or brain." *Lobe*, NCI Dictionary of Cancer Terms, NATIONAL CANCER INSTITUTE, https://www.cancer.gov/publications/dictionaries/cancer-terms/search?contains=false&q=lobe (last visited Mar. 30, 2020). *See also Henderson v. Berryhill*, No. 3:17-cv-636 (AWT), 2018 WL 4462365, at *6 (D. Conn. Sept. 18, 2018) (discussing lesions in a patient's lungs, "mostly in the right lung but at least one in the left upper lobe.").

Mem. at 9; Tr. 369 (Hartford Hospital Stat Transfer Summary (May 12, 2016)). The hospital transfer summary stated that he was "doing well and his pain [wa]s well controlled," and that he was "able to work with [p]hysical therapy." Pl.'s Mem. at 8; Tr. 370 (Hartford Hospital Stat Transfer Summary (May 12, 2016)). Mr. Davenport had to follow up with the Orthopedic Trauma Clinic and his primary care doctors, to take Tylenol and Motrin for pain, and to "participate in therapy and activities as instructed by the therapist and staff" at a rehab facility to which he was being discharged. Pl.'s Mem. at 9; Tr. 370. He stayed in the rehabilitation facility for one month. Pl.'s Mem. at 15; Tr. 249 (Disability Report—Appeal (Aug. 22, 2016)).

On June 15, 2016, Mr. Davenport had a follow up appointment with Dr. Davis while he was still undergoing inpatient rehabilitation. Pl.'s Mem. at 18; Tr. 397–98 (Stephen Davis, Orthopedic Associates of Hartford (June 15, 2016)). Dr. Davis found that he was "still having some left-sided back and rib pain," still "having some numbness on the side of his left hip," and was "tender throughout the midline of his lumbar spine." Pl.'s Mem. at 18–19; Tr. 397–98. Dr. Davis also found that Mr. Davenport was "alert and oriented" and "in no acute distress," Tr. 397, and that he "c[ould] weight bear as tolerated from [Dr. Davis's] standpoint," Pl.'s Mem. at 19; Tr. 398. Dr. Davis stated that Mr. Davenport "[wa]s going to work on core strengthening, stretching, and mobilization with physical therapy," and that he would see him again in two months. *Id.*

On July 15, 2016, Mr. Davenport went to Burgdorf Ambulatory Care Center for back pain, "stat[ing] he ha[d] trouble sitting, standing for long, lying flat." Pl.'s Mem. at 15; Tr. 15 (Gengras/Burgdorf Ambulatory Care Center Progress Notes (July 15, 2016)). As a result, he had to take Tylenol extra strength along with oxycodone and to follow up with orthopedics. *Id.*

On August 17, 2016, Mr. Davenport had another appointment with Dr. Davis. Pl.'s Mem. at 19; Tr. 395 (Stephen Davis, Orthopedic Associates of Hartford, PC (Aug. 17, 2016)). Dr. Davis noted that Mr. Davenport "still ha[d] a lot of back pain," and that "[i]t hurt[] him to roll over in bed, walk for long distances or sit for long periods of time." *Id.* Mr. Davenport asked "about refilling pain medications." *Id.* Dr. Davis stated that he "ha[d] not given him any pain medications and [he] d[id] not plan on prescribing any pain medications at this time." *Id.* Dr. Davis further stated:

> Londell can weight bear as tolerated. He will go to physical therapy for core strengthening, range of motion and stretching. I discussed with him that this is going to take more time to heal. I do not think that pain medication is the answer. I prescribed him Lodine as an anti-inflammatory. He can also ice as needed. He can take Lodine twice daily with meals. I do not think that opiates are a good idea at this point. He says he has been off opiates for several weeks because his prescriptions ran out. He is now talking about refilling them. I do not think that he should do that. I think he should try and go without pain medication and work on range of motion and strengthening. I did discuss with him that this is going to take several months to get better. I will see him back in 3 months to see how he is doing. If there are any problems, he should not hesitate to contact me.

Pl.'s Mem. at 19–20; Tr. 395–96.

The next day, on August 18, 2016, Mr. Davenport went to Burgdorf Ambulatory Care Center for a follow up visit and back pain. Pl.'s Mem. at 15–16; Tr. 400 (Gengras/Burgdorf Ambulatory Care Center Progress Notes (Aug. 18, 2016)). At that time, he "report[ed] that his pain [wa]s worse at night" and that "[h]e like[d] to receive oxycodone so that he can sleep at night." Pl.'s Mem. at 16; Tr. 400. The attending physician reported "mild tenderness on [his lower left] back on palpation." *Id.* The physician prescribed "Voltaren Gel to alternate with Lidoderm patch; Norco 10/325, [and] increased gabapentin to 300mg bid." *Id.* The physician also noted that Mr. Davenport had missed several appointments, including his first post-hospital

discharge in January 2016, another appointment with the neurology clinic on August 3, 2016, and an appointment with his dietitian. *Id.*

On August 30, 2016, Mr. Davenport went to Patricia Uhl at Mount Sinai Rehab Hospital for physical therapy. Pl.'s Mem. at 49–50; Tr. 673–79 (Mt. Sinai Rehab Hospital (Aug. 30, 2016)). Ms. Uhl noted that Mr. Davenport "currently had pain" which "interfere[d] with sleep[ and] physical activity" and was "exacerbated by[] prolonged walking, standing, positioning." Tr. 674. She also noted that Mr. Davenport "ambulate[d] slowly to clinic . . . less than erect, back guarding," and that he "was independent with gait/ambulation for 50 f[ee]t" with "[n]o assistive devices [ ] required." Pl.'s Mem. at 49–50; Tr. 675. She made a plan of care for Mr. Davenport which included home exercises and physical therapy twice a week for six weeks. Tr. 677–78. Mr. Davenport, however, dropped out after six sessions, with his last session on October 6, 2016. Pl.'s Mem. at 50; Tr. 692–93 (Mt. Sinai Rehab Hospital (Oct. 25, 2016)).

### c.  Ongoing Medical Care Following the 2015 Surgery and 2016 Car Accident

On October 5, 2016, Mr. Davenport went to Susan Taboada, an Advanced Practice Registered Nurse ("APRN"), for a follow-up to his November 2015 surgery. Pl.'s Mem. at 9; Tr. 413–22 (Hartford Hospital Neuroscience Institute Outpatient Center Records (Oct. 5, 2016)). APRN Taboada reported that Mr. Davenport had stopped following up with the stroke clinic after his May 2016 car accident, and that he had been "unsure of the reason for today's appointment." Pl.'s Mem. at 11; Tr. 414. She stated: "Neurologically the patient has made outstanding progress. He has residual mild gait imbalance, unable to perform tandem gait does not use any assistive device. Patient's chief complaint is his left sided residual back pain from his May 2016 [motor vehicle accident]." *Id.* She planned to refer Mr. Davenport to a pain clinic for

his lower back pain, and she discussed diet, exercise, and medication for secondary stroke prevention with Mr. Davenport. Pl.'s Mem. at 11–12; Tr. 418.

On December 19, 2016, Mr. Davenport returned to see physical therapist Patricia Uhl for re-evaluation. Pl.'s Mem. at 50; Tr. 694–700 (Mount Sinai Rehab Hospital (Dec. 19, 2016)). Ms. Uhl noted that he complained of chronic lower back pain with intermittent lower leg extremity pains intermittently, and that he stated he was limited in doing daily activities. Tr. 694. She diagnosed him with "low back pain, radiculopathy, abnormal postue, [and] abnormalities of gait and mobility." Pl.'s Mem. at 50; Tr. 698. She recommended physical therapy twice a week for eight to twelve visits. Tr. 699. Mr. Davenport, however, dropped out after five sessions. Pl.'s Mem. at 50; Tr. 711 (Mt. Sinai Rehab Hospital (Mar. 10, 2017)).

On January 26, 2017, Mr. Davenport went to the Hartford Hospital emergency room, "complaining of headache for the past three days, palpitations, heart fluttering, increased fatigue, shortness of breath on exertion and intermittent blurry vision." Pl.'s Mem. at 23; Tr. 827 (Hartford HealthCare, Hartford Hospital, ED Provider Notes (Jan. 26, 2017)). There, a neurologist examined him and then admitted him to the hospital. Pl.'s Mem. at 23; Tr. 874 (Hartford HealthCare, Hartford Hospital, Neurology Consultation (Jan. 27, 2017)). He received a CT scan of his head and CT angiogram of his neck and brain. Pl.'s Mem. at 4; Tr. 830–834 (Hartford HealthCare, Hartford Hospital, All ED Results (Jan. 26–27, 2017)). The CT scan and angiogram showed largely normal results. *Id.* The neurologist found Mr. Davenport to be "neurologically intact except for an inability to perform tandem gait," and that his headache, "which [wa]s throbbing in nature and [ ] associated with visual obscurations[, wa]s suggestive of migraine." Pl.'s Mem. at 23; Tr. 877 (Hartford HealthCare, Hartford Hospital, Neurology Consultation (Jan. 27, 2017)). The neurologist recommended "treating his headache with IB

metoclopramide and ketorolac," and stated that he could "be discharged home after his headache [ ] improved." Tr. 877.

Mr. Davenport left Hartford Hospital on January 27, 2017, with a plan to "continue to follow-up with physical therapy and at the outpatient stroke center as scheduled." *Id.* The neurologist found "[n]o need for further neuroimaging." *Id.*

On February 2, 2017, Mr. Davenport had to get a refill of a norco prescription. Pl.'s Mem. at 16; Tr. 14 (Gengras/Burgdorf Ambulatory Care Center, Progress Notes (Feb. 2, 2017)).

On February 23, 2017, Mr. Davenport returned for back pain, reporting that his pain was now on both sides of the lower back. Pl.'s Mem. at 16; Tr. 13 (Dr. Geevarghese, Unspecified Notes, Londell Davenport (Feb. 23, 2017)). He stated that he "feels pain if he has sudden move, turn, or shifts his body [sic]. He has had tingling sensation stretching down to his thighs. He feels the pain is deep." *Id.* The physician found that Mr. Davenport's conditions were stable and recommended that he continue with his current medication regimen for back pain and follow up with his neurologist. Pl.'s Mem. at 17; Tr. 13.

On March 21, 2017, Mr. Davenport returned to see Dr. Davis "for his multiple left-sided transverse process fractures and right inferior sacral body fracture." Pl.'s Mem. at 20; Tr. 720 (Stephen Davis, Orthopedic Associates of Hartford, PC (Mar. 21, 2017)). Mr. Davenport reported that he "[wa]s still having bilateral low back pain and numbness over his buttocks." *Id.* Dr. Davis found, on exam, that Mr. Davenport "[wa]s minimally tender throughout the paraspinal muscles and he ha[d] no midline tenderness. He c[ould] toe walk and heel walk without difficulty." *Id.* Dr. Davis found that his left transverse process fractures were healed, and sent Mr. Davenport to Dr. Sean Esmende, another physician in his office, for evaluation. *Id.*

On April 6, 2017, Mr. Davenport returned to see APRN Taboada for follow-up regarding his neurosurgery. Pl.'s Mem. at 12; Tr. 722–25 (Hartford HealthCare, Hartford Hospital, Progress Notes (Apr. 6, 2017)). APRN Taboada found that "[n]eurologically [the] patient made an excellent recovery with mild gait ataxia." Tr. 722. Mr. Davenport, however, "shared he was depressed with his slow recovery. He attempted to return to work was let go by his former boss months ago." Pl.'s Mem. at 12; Tr. 722. APRN Taboada noted that his "chief complaint continue[d] to be his left sided residual back pain from his May 2016" car accident, but that he had "not been followed by physiatry and the pain clinic," which she had recommended the prior October. Tr. 722. APRN Taboada prescribed Mr. Davenport medication for his depression and re-referred him to the pain clinic, hoping that they could help Mr. Davenport minimize the number of medications he was taking. Pl.'s Mem. at 12; Tr. 724.

On April 11, 2017, Mr. Davenport met with Dr. Esmende "for low back pain primarily on the left paraspinal region." Pl.'s Mem. at 20; Tr. 718–19. (Sean M. Esmende, Orthopedic Associates of Hartford, PC (Apr. 11, 2017)). Mr. Davenport reported that "he ha[d] continued back pain since" his car accident in May 2016, and that "he ha[d] not tried many forms of conservative spinal care such as physical therapy[ or] anti-inflammatory treatments." *Id.* Dr. Esmende reviewed Mr. Davenport's X-Rays with him "in great detail" and prescribed physical therapy and a muscle relaxant. *Id.* Dr. Esmende "explained to him that he should try some physical therapy for the next 4–6 weeks. If his symptoms did not improve, he should give Dr. Codispoti a call for an evaluation." *Id.* Dr. Esmende "explained to him that he is a nonsurgical candidate." *Id.*

On April 20, 2017, Mr. Davenport started physical therapy with Stefanie Bourassa at Hartford Hospital. Pl.'s Mem. at 50; Tr. 888–95 (Hartford HealthCare, Hartford Hospital,

Physical Therapy Initial Evaluation (Apr. 20, 2017)). Mr. Davenport reported that he was unable to stand, sit, or walk longer than 20 minutes, and unable to lift or carry more than ten pounds of groceries. Tr. 888. The physical therapist found that he presented with "limitations in lumbar flexion and extension[, ] significant [range of motion] limitations . . . . [w]eakness especially with hip extension and abduction[,] and reduced strength present in the core." Pl.'s Mem. at 50; Tr. 891. The physical therapist found further that Mr. Davenport's "[f]unctional limitations include[d] all prolonged tasks such as standing, walking, lifting and carrying" and that he was "unable to perform work tasks." *Id.* She approved Mr. Davenport for eight weeks of physical therapy, twice weekly. Pl.'s Mem. at 51; Tr. 892.

Mr. Davenport also told Ms. Bourassa "that he [wa]s battling depression . . . and also anger with the events of the past year," and the physical therapist recommended he see a behavioral health specialist. Pl.'s Mem. at 50–51; Tr. 891.

On May 4, 2017, Mr. Davenport had a psychiatric consultation with Dr. Jennifer Ferrand, PsyD Licensed Clinical Psychologist. Pl.'s Mem. at 25; Tr. 428–31 (Hartford HealthCare Behavioral Health Network, Psychological Consultation (May 4, 2017)). He "report[ed] anger and depression and completed a screening measure that suggested clinically significant depressive symptoms." *Id.* Dr. Ferrand observed that Mr. Davenport arrived on time for his appointment, "was alert and fully oriented," had "no disturbances in gait or posture, or overt indications of chronic pain." Gov't SOMF ¶ 3; Tr. 428. "There was no indication of gross cognitive deficits or thought disorder, with the exception of a mildly long response latency which was attributed to his stroke." *Id.* Dr. Ferrand also noted that Mr. Davenport "describe[d] ongoing low back pain, and left-sided numbness and stiffness from his mid-back to buttocks," and that he

"receive[s] physical therapy and takes medications, which are somewhat helpful." Pl.'s Mem. at 26; Tr. 428.

She went on to discuss Mr. Davenport's reported psychological issues, including that he experiences confusion about why certain medications have been prescribed, "he always feels nervous at home," and he "feels bounced around by his physicians, none of whom he feels have adequately or comprehensively explained his conditions, the prognosis, and the degree to which he can help his situation." Pl.'s Mem. at 26; Tr. 429. Mr. Davenport also reported that his boss had recently asked him to take time off from his job as a hairstylist after showing him "video evidence of concerning work behaviors, including swaying on his feet and irritable behavior toward customers." Tr. 429. Mr. Davenport stated that he was unaware of these behaviors but agreed to take time off. *Id.*

Dr. Ferrand stated that Mr. Davenport's "symptoms seem[ed] primarily related to his medical issues and situational stressors, including the stroke, motor vehicle accident, and their impact on his psychosocial situation." Pl.'s Mem. at 27; Tr. 430. Dr. Ferrand's "[d]iagnostic impressions . . . include[d] unspecified depressive disorder, unspecified anxiety disorder, and pain disorder with related psychological features." Pl.'s Mem. at 28–30; Tr. 431.

On May 11, 2017, Mr. Davenport "continued to have lower back pain/spasm mostly in the left side." Pl.'s Mem. at 17; Tr. 12 (Dr. Levitz, Unspecified Notes, Londell Davenport (May 11, 2017)). The physician who saw him noted that "[h]e continue[d] to feel the pain is deep and diclofenac gel ha[d] not been helpful at all." *Id.* Mr. Davenport "also want[ed] a note to go back to light duty as he want[ed] to work." *Id.* The physician found that Mr. Davenport's "[e]xam was normal except for mild tenderness on palpation in the left lower back with some spasm," and that his "lower back pain [was] likely secondary to vertebral fractures due to" his car accident. *Id.* He

prescribed Mr. Davenport norco with no refills, and planned for Mr. Davenport to continue other medications and follow up with neurology. *Id.* He also gave Mr. Davenport a back to work for light duty letter. *Id.*

On June 16, 2017, Mr. Davenport had his first scheduled follow-up appointment with Dr. Ferrand. Pl.'s Mem. at 29; Tr. 432–36 (Hartford HealthCare Behavioral Health Network, Institute of Living OP Progress Note (June 16, 2017)). He appeared "calm," "well groomed," and on time, though "[h]e was difficult to reach by phone to schedule [his] follow-up appointment." Tr. 432, 434.

At this appointment, Mr. Davenport "report[ed] that he need[ed] help both physically and emotionally." He said that he was "being evicted from his apartment and [wa]s asking [ ] the court for more time, since he ha[d] no plan for where he w[ould] go next." Pl.'s Mem. at 29; Tr. 432. He did not know what he had been prescribed and why, unsure about whether he was taking prescribed medications, and confused about what if any psychological treatment plan he had received. *Id.* Dr. Ferrand gathered clarifying information and administered screening measures "in order to better understand [Mr. Davenport's] psychiatric and cognitive status, and plan treatment." *Id.*

Dr. Ferrand found that Mr. Davenport showed

> clinically significant symptoms of depression [ ] and anxiety [ ], placing him in the "severe" range, and identifying these symptoms as making it "very difficult" for him to perform his normal routine. He described passive suicidal ideation but denies plan or intent. He described a number of maladaptive thoughts and beliefs about pain (Pain Catastrophizing Scale) and described significant quality of life impairments . . . due to his physical and mental status. On a cognitive screening measure [ ], he performed in the impaired range [ ], with deficits in visuospatial and executive functioning, short-term verbal memory, and attention.

*Id.* Dr. Ferrand noted further that Mr. Davenport

> would benefit from a more comprehensive neuropsychological evaluation, to more clearly delineate the extent and nature of his cognitive deficits. He is reporting significant symptoms of depression and anxiety but it is unclear whether these symptoms reflect organic pathology, a pre-existing psychiatric condition, or other issues secondary to his medical problems (i.e., a mood disorder or Posttraumatic Stress Disorder). He was referred to the Division of Neuropsychology at the [Institute of Living] for a more comprehensive evaluation and will be seen at the end of July. He will be followed by this writer to determine an appropriate placement for treatment of his mental health condition(s).

*Id.*

On June 22, 2017, Paulette Caruso, a licensed clinical social worker at Burgdorf Health Center, wrote a letter stating that "Mr. Davenport suffers from chronic back pain due a motor vehicle accident with vertebral fractures," that he "has a history of cerebellar infarct[10] due to vertebral artery dissection[11]" and "a history of anxiety and depression." Pl.'s Mem. at 56–57; Tr. 458 (Letter from Paulette Caruso to Greater Hartford Legal Aid, Inc., Burgdorf/Bank of America Health Center, St. Francis Hospital and Medical Center (June 22, 2017)). She stated further that "[i]t is imperative that Londell not be disrupted from his current housing as that will have significant ramifications on his current health conditions." *Id.*

On July 7, 2017, Mr. Davenport returned to see Dr. Ferrand. Pl.'s Mem. at 45; Tr. 437–41 (Hartford HealthCare, Institute of Life OP Progress Note (July 7, 2017)). He arrived "two hours

---

[10] An "infarct" is an "area of necrosis resulting from a sudden insufficiency of arterial or venous blood supply." *443430 Infarct*, STEDMANS MEDICAL DICTIONARY 443430 (2014). The cerebellum is a part of the brain "located beneath and behind the cerebrum towards the back of the skull. It receives sensory information from the body through the spinal cord. It helps coordinate muscle action and control, fine movement, coordination, and balance." *Effects of Stroke*, JOHNS HOPKINS MEDICINE, https://www.hopkinsmedicine.org/health/conditions-and-diseases/stroke/effects-of-stroke (last visited Mar. 30, 2020).

[11] "Vertebral artery dissection" refers to a tear in wall of a neck artery that "allows blood to leak between the layers [of different types of tissue] and separate them." *Cervical (Carotid or Vertebral) Artery Dissection*, CLEVELAND CLINIC (last updated May 24, 2019), https://my.clevelandclinic.org/health/diseases/16857-cervical-carotid-or-vertebral-artery-dissection.

early and in the process missed his appointment with Dr. Monti," reporting that he had been

confused about his appointment times and that he was disappointed to now not be able to see Dr.

Monti for another month. Tr. 437. He stated that he "continue[d] to experience stiffness,

tightness and tingling in his joints and extremities, and note[d] that physical therapy [wa]s

effective during appointments but le[d] to exacerbated pain almost immediately following." *Id.*

Dr. Ferrand found that he "continue[d] to experience confusion and symptoms of depression and

anxiety." *Id.* They planned for him to "continue in physical therapy but [to] communicate more

openly with therapists about pain after sessions." *Id.*

On July 21, 2017, Mr. Davenport went again to Dr. Ferrand. Pl.'s Mem. at 31–32; Tr.

442–46 (Hartford HealthCare, Institute of Life OP Progress Note (July 21, 2017)). Mr.

Davenport arrived on time, "calm" and "well groomed," but reporting that he was "'not

significantly better' from either a mental or physical perspective." Pl.'s Mem. at 31; Tr. 442–43.

"He report[ed that] his boss w[ould] not let him come back to work part-time, despite his belief

that he could manage it, without a note from his MD." Pl.'s Mem. at 31; Tr. 442. Mr. Davenport

stated that he had "requested such a note from his [primary care provider] who reportedly felt

uncomfortable endorsing [Mr. Davenport's] ability to work." Pl.'s Mem. at 31–32; Tr. 442. Dr.

Ferrand had a "lengthy discussion" with Mr. Davenport "about which physician he should ask to

evaluate his suitability to return to part-time employment." Pl.'s Mem. at 32; Tr. 442. They also

"discussed the benefits that work would confer, from a psychological perspective, and [Dr.

Ferrand was] supportive of patient returning to work when it is medically safe to do so." *Id.* Mr.

Davenport stated that "he need[ed] other psychosocial assistance prior to returning to work," and

Dr. Ferrand directed him to resources. *Id.* Dr. Ferrand recommended a plan "to continue to

address [Mr. Davenport's] mood symptoms and pain from a supportive and [cognitive-behavioral therapy] perspective." Tr. 442.

Early the next morning, on July 22, 2017, Mr. Davenport went to the Hartford Hospital Emergency Room at 4:09 a.m. for a sore throat. Pl.'s Mem. at 23; Tr. 863–66 (Hartford HealthCare, Hartford Hospital, ED Records (July 22, 2017)). He returned later that day, at 8:52 p.m., for a sore throat and headache, and a provider noted that he "was here last night for same and left, unsure if he was seen." Pl.'s Mem. at 23; Tr. 867–73 (Hartford HealthCare, Hartford Hospital, ED Records (July 22, 2017)).

On July 27, 2017, Mr. Davenport met with Dr. Vincent Codispoti, whom Dr. Esmende had recommended. Pl.'s Mem. at 21; Tr. 714–16 (Orthopedic Associates of Hartford, PC (July 27, 2017)). Dr. Codispoti wrote that Mr. Davenport "continued to deal with pain in the left lower lumbar region with radiation of pain and paresthesias into the gluteal area and the proximal left lower extremity," that he "rate[d] his pain as a 4/10 in severity and state[d] that it is exacerbated with prolonged standing." Pl.'s Mem. at 21; Tr. 715. Dr. Codispoti found, upon physical exam, that alignment of Mr. Davenport's spine "appear[ed] normal on gross inspection," that there was "no swelling, erythema or discoloration of the lumber region or the . . . lower extremities," that there was "mild pain with lumbar extension" and "pain with lumbar flexion, which is limited to approximately 45 degrees," and that there was "mild tenderness to palpation of the lumbar spine and surrounding paraspinal musculature bilaterally." Pl.'s Mem. at 21–22; Tr. 715. "Given the persistence of [Mr. Davenport's] pain," Dr. Codispoti recommended "further evaluation with an MRI of the lumbar spine" and follow up to "consider further treatment options." *Id.*

On August 3, 2017, Mr. Davenport returned for another appointment with Dr. Ferrand. Pl.'s Mem. at 36–37; Tr. 447–52 (Hartford HealthCare, Institute of Living OP Progress Note (Aug.

3, 2017)). Dr. Ferrand found that Mr. Davenport "continue[d] to present with dysphoric mood[12], anxious affect and significant psychosocial stressors related to multiple medical conditions, loss of job and impending loss of home." Pl.'s Mem. at 36; Tr. 447. He reported that "he ha[d] been struggling to socialize with friends and family," that he was "not interested in leaving the house and [wa]s reluctant to communicate his concerns/ problems openly to others." *Id.* He reported that he had been looking for a job as a certified medical assistant and wants to return to a job in the medical field, but that he has been "disappointed by the lack of offers that have come in his field." *Id.* Dr. Ferrand noted that Mr. Davenport "recognize[d] that some of his cognitive limitations may make it difficult to work as a medical assistant, but feels disappointed that potential employers have not taken a chance on him." *Id.* Dr. Ferrand "[p]rovided feedback and encouragement about the potential to rehabilitate injuries to the point where a return to work would be safe and satisfying." *Id.*

On August 7, 2017, Mr. Davenport returned to see APRN Taboada for evaluation of the effectiveness of medication for depression. Pl.'s Mem. at 12; Tr. 725–27 (Hartford HealthCare, Hartford Hospital, Progress Notes (Aug. 7, 2017)). Mr. Davenport "complain[ed] of ongoing headaches 4–5 times a week as well as short-term memory challenges" and "stated uncertainty of which medications he was taking." Pl.'s Mem. at 13; Tr. 727. APRN Taboada found that "[n]eurologically [Mr. Davenport] ha[d] made good progress with residual mild gait imbalance." Pl.'s Mem. at 12; Tr. 725. APRN Taboada gave Mr. Davenport a print out of his medications personally reviewed them with him and referred him to the Institute of Living for "neuropsych/ cognitive testing to assess recent recall memory problems." Pl.'s Mem. at 13; Tr. 727.

---

[12] "Dysphoric mood" is a "low mood that may include chronic dissatisfaction, restlessness, or depression." *Depression: Glossary of Depression-Related Terms*, CLEVELAND CLINIC (last updated Oct. 15, 2015), https://my.clevelandclinic.org/health/articles/9285-depression-glossary-of-depression-related-terms.

On August 16, 2017, Mr. Davenport had the MRI ordered by Dr. Codispoti, which "revealed a left central annular fissure[13]" in his spine, but "[o]therwise normal lumbar spine." Pl.'s Mem. at 5; Tr. 729 (Orthopedic Associates—Hartford, MR Spine (Aug. 16, 2017)).

On August 17, 2017, Mr. Davenport returned to Dr. Ferrand, and reported that his pain and mood had improved, "though he continue[d] to feel somewhat hopeless about the future." Pl.'s Mem. at 37; Tr. 452 (Hartford HealthCare, Institute of Living OP Progress Note (Aug. 17, 2017)). They discussed his recent visit with APRN Taboada and her "recommendations to manage stroke risk factors, including medication compliance, exercise, managing bloodpressure and blood sugar, and consuming a healthy diet." *Id.* Dr. Ferrand reported that Mr. Davenport was "becoming more open, trusting in therapy process." *Id.*

On August 29, 2017, however, Mr. Davenport reported to physical therapist Bourassa that he "was doing really well until [he] went on vacation with [his] family and now [he] think[s he's] back at square one." Pl.'s Mem. at 51; Tr. 937–40 (Hartford HealthCare, Hartford Hospital, Physical Therapy Daily Note (Aug. 29, 2017)). Ms. Bourassa found that Mr. Davenport "[d]emonstrated challenge with re-initiation" of strengthening process "and significant fatigue." Pl.'s Mem. at 51; Tr. 938.

On August 31, 2017, Mr. Davenport reported to Dr. Ferrand that he had attempted suicide by taking pills. Pl.'s Mem. at 37; Tr. 1058 (Hartford HealthCare, Institute of Living OP Progress Note (Aug. 31, 2017)). "He fell asleep after taking the pills, woke up and contacted his mother for help." *Id.* He stated that "his psychotherapy sessions and physical therapy [we]re helping but that 'it's not enough.'" He stated further, "'[I] can't fight the feelings I'm having,' and despite

---

[13] "Annular fissures are a degenerative deficiency of one or more layers that make up the [exterior] of the intervertebral disc." *Van Allen v. Colvin*, No. 3:15-CVcv-174 (DJS), 2016 WL 5660377, at *3 (D. Conn. Sept. 29, 2016) (quoting https://radiopaedia.org/articles/annular-fissure. (last visited September 28 2016)).

compliance with treatment and reaching out to all the avenues [Dr. Ferrand] suggested (i.e., Legal Aid to help with [Social Security Disability Insurance] application), he [wa]s having a hard time accepting the possibility that he may be permanently disabled or may experience ongoing chronic pain." *Id.* Dr. Ferrand referred Mr. Davenport for psychopharmacological consultation at an outpatient clinic and planned "for more frequent follow-up in the context of increased dysphoria and recent suicidal gesture." *Id.*

On September 7, 2017, Mr. Davenport returned to see Dr. Ferrand. Pl.'s Mem. at 38–39; Tr. 1063–67 (Hartford HealthCare, Institute of Living OP Progress Note (Sept. 7, 2017)). Mr. Davenport "present[ed] with mildly improved mood and pleasant affect" and was "feeling a bit more hopeful." He and Dr. Ferrand "discuss[ed] how he arrived at such a place of despair and hopelessness last week." Pl.'s Mem. at 38; Tr. 1063. Dr. Ferrand noted:

> [Mr. Davenport] reports[:] "I slipped into a space where I didn't realize I was giving up." He notes he "gave in" to anxiety and isolation and feels his lack of activity and connection to others was a primary trigger for his worsening mood and the recent suicidal gesture. He recognizes now that if he works on keeping himself occupied and doing pleasant things, per our discussions, he will be more likely to stave off future crises.

Pl.'s Mem. at 38–39; Tr. 1063. Dr. Ferrand and Mr. Davenport together called a clinic to schedule an appointment for medication consultation the next month, and they planned to continue weekly psychotherapy. Pl.'s Mem. at 39; Tr. 1063.

On September 12, 2017, Mr. Davenport went to a physical therapy appointment with Ms. Bourassa. Pl.'s Mem. at 52; Tr. 1160–63 (Hartford HealthCare, Hartford Hospital, Physical Therapy Daily Note (Sept. 12, 2017)). Ms. Bourassa discontinued the session after fifteen minutes because Mr. Davenport was on a seven-day cleanse and his stomach was bothering him. Pl.'s Mem. at 52; Tr. 1160–61. Ms. Bourassa noted that Mr. Davenport "[wa]s consistently pre-

occupied with weight loss and weight management." *Id.* They "[d]iscussed his need for continued care coordination with behavioral health network team . . . ." *Id.*

On September 22, 2017, Mr. Davenport returned to see Dr. Ferrand. Pl.'s Mem. at 39; Tr. 1068–72 (Hartford HealthCare, Institute of Living OP Progress Note (Sept. 22, 2017)). He reported he was "'still a wreck in [his] mind' but 'trying not to let it keep [him] depressed.'" Pl.'s Mem. at 39; Tr. 1068. "Though he continue[d] to have anxious thoughts and worries about the future, he report[ed] he [wa]s in a much better place mentally, with no thoughts of suicide and continued regret about his suicidal gesture several weeks ago." *Id.* "He continue[d] to take his medications regularly and report[ed] he [wa]s feeling better physically, with the exception of worsening shoulder pain which ha[d] limited his right arm movement and ability to push or pull things." *Id.* Mr. Davenport had not sought treatment for the pain yet, hoping it would resolve on its own, because he was "scared to hear about one more thing wrong with [him]." Pl.'s Mem. at 39–40; Tr. 1068. They planned for continued therapy, and Mr. Davenport "agree[d] to present to urgent care immediately following [their] appointment, to have his arm/shoulder evaluated." Pl.'s Mem. at 40; Tr. 1068.

On September 26, 2017, Mr. Davenport returned to see Ms. Bourassa for physical therapy. Pl.'s Mem. at 52; Tr. 1164–67 (Hartford HealthCare, Hartford Hospital, Physical Therapy Daily Note (Sept. 26, 2017)). He reported "feeling better in his back" but that "his shoulder was a little sore and he would like to try PT for that next." Pl.'s Mem. at 52; Tr. 1164. Ms. Bourassa found that he continued to make improvements in strength and mobility, and they discussed discharging Mr. Davenport for his back in order to address his shoulder. Tr. 1165.

On October 3, 2017, Mr. Davenport saw Ms. Bourassa again, reporting: "I'm feeling stiffness in the lower back and down the leg. I tried to do different stretches and exercises at

home and that may be why." Pl.'s Mem. at 52; Tr. 1168–71 (Hartford HealthCare, Hartford Hospital, Physical Therapy Daily Note (Oct. 3, 2017)). Ms. Bourassa found that Mr. Davenport "continue[d] to be challenged with core strengthening," "progressive hip strengthening," and "with all flexibility tasks," and that he "demonstrate[d] difficulties with maintaining core activation with hip hinging tasks." Pl.'s Mem. at 52; Tr. 1169. She planned to to discharge him for his back and address his shoulder. *Id.*

On October 10, 2017, Mr. Davenport reported to Ms. Bourassa that his "back felt really good after last time but my shoulder has been worse." Pl.'s Mem. at 52–53; Tr. 1172–75 (Hartford HealthCare, Hartford Hospital, Physical Therapy Daily Note (Oct. 10, 2017)). He "note[d] that he [wa]s still having trouble with his shoulder and therefore avoided arm movements . . . ." Pl.'s Mem. at 53; Tr. 1173. Ms. Bourassa again planned to discharge him for his back, and she planned to evaluate his shoulder once he followed up with an orthopedic specialist. *Id.*

On October 17, 2017, Mr. Davenport had an initial psychiatric evaluation with Art Guerra, APRN, at the Hartford HealthCare Behavioral Health Network. Pl.'s Mem. at 40; Tr. 1073–82 (Hartford HealthCare Behavioral Health Network, Initial Medical Assessment (Oct. 17, 2017)). Mr. Davenport stated: "I don't know why I'm here." Pl.'s Mem. at 40; Tr. 1073. He presented with depression and discussed problems with his memory, saying: "I remember my life but recent things I have trouble remembering." *Id.* He stated that he was a hairstylist but when he recently went back to work "his boss wasn't comfortable with his performance." *Id.* Mr. Davenport stated he wanted to try an antidepressant and wanted to return to work. Pl.'s Mem. at 41; Tr. 1082. APRN Guerra reached out to Dr. Ferrand, and he planned that once he received Mr.

Davenport's complete medication list from APRN Taboada he would consider an SSRI[14] for Mr. Davenport. *Id.*

On October 18, 2017, Mr. Davenport went to the Hartford Hospital emergency room for "chronic nonintractable headache, migraine and right shoulder pain." Pl.'s Mem. at 23; Tr. 951–1001 (Hartford HealthCare, Hartford Hospital, ED Records (Oct. 18–19, 2017)). A physician who saw Mr. Davenport found that he had "mild decreased strength in the right upper extremity compared to left upper extremity," ordered a CT scan of his neck and head, and ordered a neurology consult. Pl.'s Mem. at 24; Tr. 953. The consulting neurologist found that Mr. Davenport had diminished motor function in his right finger, wrist, elbow, and shoulder, due to pain. Tr. 998. Mr. Davenport said he "fe[lt] like his bone [wa]s being pulled out of his [shoulder] socket." *Id.*

Mr. Davenport had CT scans of his head, neck, and right shoulder. Pl.'s Mem. at 5; Tr. 1037–41 (Hartford Hospital, Results (Oct. 18–19, 2017)); Tr. 1332 (Hartford HealthCare, Hartford Hospital, All ED Results (Oct. 18, 2017)). The scans showed "[n]o acute brain abnormalities" or aneurysm, Tr. 999, though they did show "redemonstration of postsurgical changes following left occipital craniotomy and left cerebellar encephalomachia," Pl.'s Mem. at 5; Tr. 1037, 1040. The neurologist noted that Mr. Davenport was being followed by APRN Taboada in the stroke clinic for his chronic headaches since his stroke in 2015. Pl.'s Mem. at 24; Tr. 996. The neurologist also noted that he "was referred to pain managemend but report[ed] he did not want to make that commitment." *Id.* The neurologist noted further that Mr. Davenport "report[ed] some right shoulder pain for which he was evaluated in [an] urgent clinic." *Id.* An x-

---

[14] A selective serotonin reuptake inhibitor, or "SSRI," is a type of antidepressant medication. Mayo Clinic Staff, *Selective serotonin reuptake inhibitors (SSRIs)*, MAYO CLINIC (Sept. 17, 2019), https://www.mayoclinic.org/diseases-conditions/depression/in-depth/ssris/art-20044825.

ray taken by the urgent clinic showed no fractures. *Id.* They "suspected his pain was musculoskeletal in etiology due to rotator cuff injury" and documented limitations in his movement secondary to pain." *Id.*

The neurologist recommended outpatient management for Mr. Davenport's chronic headache and shoulder pain, and stated that Mr. Davenport could "follow up with his neurologist for the headaches and possibly orthopedics for his shoulder pain." Pl.'s Mem. at 25; Tr. 1000. Medical staff offered Mr. Davenport pain medication throughout his time in the emergency department, and he refused. Pl.'s Mem. at 25; Tr. 994.

On October 19, 2017, after being discharged from the emergency department, Mr. Davenport had another appointment with APRN Guerra, where he reported: "I am still depressed and am in more pain." Pl.'s Mem. at 41; Tr. 1083–92. He "spoke of having increased pain related to a shoulder injury and migraine pain" and "worsened depression symptoms related to his pain," though no suicidal ideation. *Id.* They planned for Mr. Davenport to follow up with orthopedics and physical therapy for his pain. *Id.*

On October 24, 2017, Mr. Davenport saw Ms. Bourassa again for physical therapy, and reported that his "shoulder pain was making his back pain worse." Pl.'s Mem. at 52; *see also* Tr. 1176–85 (Hartford HealthCare, Hartford Hospital, Physical Therapy Daily Note (Oct. 24, 2017)). He "demonstrate[d] limitations in lumbar flexion [range of motion] but full motion in all other movement patterns." Pl.'s Mem. at 53; Tr. 1177. He also showed "[i]mprovements in strength but continue[d] to have difficulties with hip extension [range of motion] and strength deficits." *Id.* His "[f]unctional limitations include[d] prolonged sitting, walking[,] reaching[,] and cleaning tasks." *Id.* They planned for him to observe his home tasks and be more consistent with a home program to assess the need to address his shoulder versus his back. *Id.*

On November 6, 2017, Mr. Davenport again met with APRN Guerra, reporting that he had increased depressed mood and sadness, and thoughts of death, but not suicidality. Pl.'s Mem. at 42; Tr. 1093–1104 (Hartford HealthCare Behavioral Health Network, Medication Management Document (Nov. 6, 2017)). He also had significant stress regarding his search for a new apartment. Pl.'s Mem. 42; Tr. 1093. APRN Guerra increased his dose of antidepressant, recommended that he stay in therapy with Dr. Ferrand, and recommended that he follow up with orthopedics and his physical therapist regarding his pain. Pl.'s Mem. at 42; Tr. 1102. APRN Guerra also sent an e-mail to Dr. Ferrand to facilitate their next appointment. Pl.'s Mem. at 42; Tr. 1094.

On November 7, 2017, Mr. Davenport saw Ms. Bourassa again for physical therapy. Pl.'s Mem. at 53–54; Tr. 1185–88 (Hartford HealthCare, Hartford Hospital, Physical Therapy Daily Note (Nov. 7, 2017)). Ms. Bourassa wrote:

> Londell notes that his shoulder pain has worsened and that he would like to transition to care for his shoulder and discharge the back case. He notes that his back is able to tolerate all exercises daily and he notices when he performs consistently the pain is tolerable and he feels less tightness.

*Id.*

On November 19, 2017, Dr. Ferrand completed a medical assessment of Mr. Davenport. Pl.'s Mem. at 57; Gov't SOMF ¶ 4; Tr. 1190–97 (Hartford Hospital, Institute of Living, Medical Report for State Administered General Assistance (Nov. 19, 2017)). Dr. Ferrand stated that she was treating Mr. Davenport for unspecified depressive disorder, unspecified anxiety disorder, pain disorder with related psychological factors, and major vascular neurocognitive disorder. Pl.'s Mem. at 57; Gov't SOMF ¶ 4; Tr. 1192. She noted that Mr. Davenport had current pain in his back with left-sided weakness and "[n]ewer pain symptoms in [his right] shoulder," and that

he could not lift his arm. Pl.'s Mem. at 57; Tr. 1192. Dr. Ferrand reported that Mr. Davenport "lack[ed] motivation and energy due to depression and ha[d] panic and anxiety that ma[d]e socialization difficult." Tr. 1193. She noted that his "cognitive and physical issues also interfere[d] with his ability to do his previous job(s)." *Id.* Dr. Ferrand opined that, approximately 21–25% of the time, Mr. Davenport's symptoms would likely interfere with the level of attention and concentration needed to perform even simple work tasks. Tr. 1195. She specifically noted that Mr. Davenport "may lack the attention/concentration needed to perform complex tasks." *Id.*

Dr. Ferrand also opined that Mr. Davenport was capable of tolerating low stress, and he was not significantly limited in his ability to remember work like procedures, understand simple and detailed instructions, interact with the public, ask simple questions, maintain attendance and perform activities within a schedule, sustain a routine without supervision, make simple work related decisions, and work in proximity to others. Dr. Ferrand found Mr. Davenport was moderately limited in carrying out detailed instructions, maintaining attention and concentration for extended periods, completing a normal workday without interruptions, and traveling in unfamiliar places. Dr. Ferrand, however, found Mr. Davenport had no limitations in carrying out short, simple instructions; maintaining socially appropriate behavior;, accepting instruction and criticism; being aware of normal hazards; and getting along with coworkers. Tr. 1196–97.

Dr. Ferrand also noted that Mr. Davenport had some physical issues: "current pain in back, with left-side weakness and numbness," and "newer pain symptoms in [his right] shoulder" which caused him to "feel[] very weak" and be unable to lift his arm. Tr. 1192. However, she stated that she was "not the best person to explicate" his "physical limitations." Tr. 1193. Additionally, in answer to the question, "How long do you expect that the patient will be unable to work?," Dr. Ferrand checked the box for twelve months or more, but she also wrote in the

margin she "d[id] not feel qualified to make this determination." Tr. 1192; *see also* Pl.'s Mem. at 57; Gov't SOMF ¶ 4.

### 1. Disability Applications

Mr. Davenport first filed an application for supplemental security income (SSI) benefits under Title XVI of the SSA on December 21, 2015. Tr. 107–18 (Disability Determination Explanation (Mar. 3, 2016)). He alleged his disability began November 12, 2015, with his stroke and brain surgery. Tr. 107.

On March 3, 2016, a disability specialist adjudicator denied Mr. Davenport's application after finding that, although his condition was severe, it was expected to improve sufficiently that he would be able to work again within the next twelve months. Tr. 116. The adjudicator stated that they "d[id] not have sufficient vocational information to determine whether [Mr. Davenport could] be expected to perform any of [his] past relevant work. However, based on the evidence in file, [they] determined that [he was] expected to be able to adjust to other work." *Id.* Mr. Davenport received the decision on March 17, 2016. Tr. 133–35.

On May 11, 2016, Mr. Davenport requested reconsideration of his request. Tr. 137–38.

On August 31, 2016, another adjudicator re-affirmed the initial denial. Tr. 119–32. The adjudicator based her decision, in part, on assessments by two consultants: Dr. Joseph Connolly, MD, and Dr. Katrin Carlson, PsyD. Tr. 125, 127–28, 131. On June 21, 2016, Dr. Carlson opined that Mr. Davenport was "moderately limited" in his "ability to carry out carry out detailed instructions, maintain attention and concentration for extended periods, and complete a normal workday/workweek without interruption," but "not significantly limited in his ability to carry out simple directions, maintain a schedule, sustain a routine without supervision, make simple work related decisions, and work in proximity to others." Tr. 128. Dr. Carlson also opined that Mr.

Davenport was capable of carrying out simple, repetitive, routine tasks for at least two-hour periods in a setting without strict time or productivity expectations.

On September 16, 2016, Mr. Davenport learned that his request for reconsideration had been denied. Tr. 140–42.

On November 3, 2016, Mr. Davenport requested a hearing before an Administrative Law Judge of the Office of Disability Adjudication and Review ("ALJ"). Tr. 143–44. He received acknowledgement of his request on December 9, 2016. Tr. 146–48.

On July 28, 2017, Mr. Davenport received notificatgion of a hearing before an ALJ had been set for November 29, 2017. 158–62.

On November 29, 2017, ALJ Louis Bonsangue held a hearing on Mr. Davenport's application for benefits, Tr. 48–106, where Mr. Davenport had counsel, and Edmond Calandra participated by phone as a vocational expert, Tr. 50.

On February 28, 2018, ALJ Bonsangue issued a decision denying Mr. Davenport's application for benefits. Tr. 25–27.

On March 15, 2018, Mr. Davenport requested a review of the hearing, claiming that the "ALJ did not consider all of the claimant's impairments, erred in his evaluation of the evidence, particularly opinion evidence," and that the ALJ's decision was "not supported by substantial evidence." Tr. 185.

On May 21, 2018, Mr. Davenport filed a late request with the Appeals Council for review of the ALJ's decision. Tr. 21.

On August 3, 2018, the Appeals Council found that there was good cause for Mr. Davenport to have filed a late request of review of the ALJ's decision, but the Appeals Council ultimately denied the request, affirming the ALJ's decision. Tr. 1–4.

## 2. ALJ Decisions

On February 28, 2018, ALJ Bonsangue issued his decision denying Mr. Davenport SSI benefits. Tr. 28–42.

At Step One of the sequential evaluation, the ALJ found Mr. Davenport had not engaged in substantial gainful activity. Tr. 30. At Step Two, the ALJ found that Mr. Davenport had the following severe medically determinable impairments: cerebral vascular accident, spine disorder, organic brain syndrome, depressive disorder, and anxiety disorder. *Id.* At Step Three, the ALJ found that Mr. Davenport did not have an impairment or combination of impairments that met or medically equaled the severity of any impairment listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. Tr. 31.

At Step Four, the ALJ determined that Mr. Davenport had the residual functional capacity ("RFC") to perform light work with the following additional limitations: he can stand and/or walk for four hours in an eight-hour workday; he needs a sit/stand option at will while remaining on tasks; he cannot climb ladders, ropes, or scaffolds; he must avoid moving mechanical parts and unprotected heights; and he can perform simple, routine, repetitive tasks for two hour increments in an eight-hour workday with no strict time or production quotas. Tr. 33. He also determined that Mr. Davenport had no past relevant work. Tr. 40.

At Step Five, the ALJ determined that, given Mr. Davenport's age, education, and vocational profile, he could perform work that exists in significant numbers in the national economy. Tr. 40. The ALJ relied upon the testimony of impartial vocational expert Edmond

Calandra that someone with Mr. Davenport's RFC could perform the following occupations

including: solderer,[15] gluer, and assembler. Tr. 41.

### B. Procedural History

On October 1, 2018, Mr. Davenport filed a Complaint against then-Acting Commissioner

Nancy A. Berryhill. Compl., ECF No. 1 (Oct. 1, 2018).

On the same day, the Court posted a Standing Scheduling Order in Social Security Cases,

stating, among other things: "[T]o expedite the Court's consideration of these motions, counsel

for the parties must confer to prepare a Stipulation of Facts based on the administrative record.

The Stipulation of Facts shall contain page citations to the administrative record and be filed as a

separate document contemporaneously with the plaintiff's motion." ECF No. 4 (Oct. 1, 2018).

On December 18, 2019, the Social Security Administration filed the Social Security

Transcripts. Tr., ECF No. 16 (Dec. 18, 2019).

On March 8, 2019, Mr. Davenport moved to reverse the decision of the Commissioner,

Pl.'s Mot. to Reverse; Pl.'s Mem, and also moved to waive the Standing Scheduling Order's 40-

page limitation on memoranda. Pl.'s Mot. for Waiver of Page Limitation, ECF No. 20 (Mar. 8,

2019). Mr. Davenport filed a 62-page memorandum of law, including a 41-page facts section

with unnumbered paragraphs. Pl.'s Mem. (for example, at 3: "I suspect the patient is likely

experiencing a migraine, which was more than likely precipitated by his muscle spasm in his

neck. (R. at 316). ADDENDUM: he is feeling better, although he complains he continues to have

left-sided neck pain, 'in the muscles', the patient also complains that when he stands up he feels

'dizzy'. I'll give the patient a dose of Motrin now, as well as a dose of Antivert.").

---

[15] The ALJ's decision lists this occupation as "Sodder, DOT 813.684-022" Tr. 41, but both the hearing transcript and the Dictionary of Occupational Titles identify this occupation as "solderer," Tr. 100; Solderer, Production Line, DICOT 813.684-022, 1991 WL 681592 (1991).

On March 13, 2019, the Commissioner filed a memorandum in opposition to Plaintiff's motion for waiver, pointing out that the parties did not confer to file a Stipulation of Facts as required by the Standing Scheduling Order. Gov't Opp'n to Waiver of Page Limit. The Commissioner also noted that the District of Connecticut subsequently issued a revised Standing Scheduling Order for Social Security cases, but that the revised order was never posted in this case. *Id.* (citing Revised Standing Scheduling Order).

With regard to statements of facts, the Revised Standing Scheduling Order states as follows:

> Plaintiff shall file, as a separate document, a Statement of Material Facts consisting of numbered paragraphs and supported by specific page citations to the Certified Administrative Record. The statement must reference facts in the [ ] Record as opposed to conclusions of law. The Statement shall not exceed 20 pages. . . . Within 60 days after Plaintiff files the Statement of Material Facts, the Defendant shall file a responsive statement of facts that corresponds to Plaintiff's Statement of Material Facts and indicate if the Defendant adopts the contents of each paragraph as presented. . . . The Statement shall not exceed 20 pages.

Standing Scheduling Order at 3.

The Commissioner asked the Court to deny Plaintiff's motion for leave to exceed the page limit, to clarify which standing scheduling order applies in this case, and to require Plaintiff to refile his motion to reverse the Commissioner's decision following the appropriate Standing Scheduling Order's requirements. Gov't Opp'n to Waiver of Page Limit.

The Court did not rule on these motions.

On May 7, 2019, the Commissioner moved for an order affirming her decision. Gov't Mot. to Affirm; Gov't SOMF; Gov't Mem.

Mr. Davenport did not file a reply.

## II.     STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), a district court reviewing a disability determination "must determine whether the Commissioner's conclusions 'are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard.'" *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998) (quoting *Beauvoir v. Chater*, 104 F.3d 1432, 1433 (2d Cir. 1997)); *see also Moreau v. Berryhill*, No. 3:17-cv-396 (JCH), 2018 WL 1316197, at *3 (D. Conn. Mar. 14, 2018) ("Under section 405(g) of title 42 of the United States Code, it not a function of the district court to review *de novo* the ALJ's decision as to whether the claimant was disabled . . . . Instead, the court may only set aside the ALJ's determination as to social security disability if the decision 'is based upon legal error or is not supported by substantial evidence.'") (internal citation omitted) (quoting *Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998)).

A court first "reviews the Commissioner's decision to determine whether [she] applied the correct legal standard." *Byam v. Barnhart*, 336 F.3d 172, 179 (2d Cir. 2003) (citing *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999) (internal citations omitted)). Then, "the Court examines the record to determine if the Commissioner's conclusions are supported by substantial evidence." *Id.* "Even if the Commissioner's decision is supported by substantial evidence, legal error alone can be enough to overturn the ALJ's decision." *Ellington v. Astrue*, 641 F. Supp. 2d 322, 328 (S.D.N.Y. 2009) (citing *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir.1987)).

"Substantial evidence is 'more than a mere scintilla.'" *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 447 (2d Cir. 2012) (quoting *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009)). "'It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Moran*, 569 F.3d at 112 (quoting *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008); *accord Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004) ("Substantial

evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). This is a "very deferential standard of review—even more so than the 'clearly erroneous' standard." *Brault*, 683 F.3d at 448 (quoting *Dickson v. Zurko*, 527 U.S. 150, 153 (1999)).

## III. DISCUSSION

Under the Social Security Act, "a claimant must establish an 'inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.'" *Smith v. Berryhill*, 740 F. App'x 721, 722 (2d Cir. 2018) (summary order) (citing 20 C.F.R. § 404.1505(a)).

To determine whether a claimant is disabled, the ALJ must follow a five-step evaluation process:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a "residual functional capacity" assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's residual functional capacity, age, education, and work experience.

*McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014) (citing *Burgess*, 537 F.3d at 120; 20 C.F.R. §§ 404.1520(a)(4)(i)–(v), 416.920(a)(4)(i)–(v)). "[T]he claimant has the general burden of proving that he or she has a disability within the meaning of the Act, and bears the burden of proving his or her case at steps one through four." *Burgess*, 537 F.3d at 128 (internal quotation

marks and citation omitted). With Step Five, "the burden shift[s] to the Commissioner to show there is other work that [the claimant] can perform." *Brault*, 683 F.3d at 445.

Mr. Davenport argues that the ALJ's decision is not supported by substantial evidence, Pl.'s Mem. at 42, and that "[t]he final decision should be reversed and the claim allowed as of the amended disability onset date," *id.* at 61.

In his view, "[t]he ALJ used the same vague recitation of facts . . . as the basis for almost all of his fact findings":

> "The claimant was consistently alert, fully oriented, well developed, well nourished, neat, casually dressed and groomed, cooperative, clean, and in no acute or clear distress. In November of 2015, the claimant made excellent progress from his stroke following surgery. In June of 2016, he was able to bear weight on his foot. In October of 2016, the claimant had made outstanding progress neurologically and he only had mild residual gait imbalance and his motor examination, muscle stretch reflexes, sensory examination, cerebellar, coordination, and erect posture were all normal and/or intact. In August of 2017, the claimant had made good progress with his physical therapy and November of 2017, his back was able to tolerate all exercises daily and he was discharged from physical therapy for his back."

*Id.* (internal citations omitted). He claims that the ALJ's recitation of these same facts is the basis for "why [Mr.] Davenport did not meet the listings for five different impairments (spine, vascular insult to the brian, organic brain syndrome, depressive disorder and anxiety)," *id.* (citing Tr. 31); "why Mr. Davenport's statements regarding his inability to sustain [substantial gainful activity] were not credible," *id.* (citing Tr. 37); "why the Consultative Examiner's opinion was given little weight," *id.* (citing Tr. 38); and "why the treating source opinions were given little weight," *id.* (citing Tr. 38–39).

Mr. Davenport essentially makes three claims as to why the ALJ's decision should be reversed: (1) the ALJ "advanced th[e above] identical paragraph to explain why [Mr.

Davenport's severe cerebral vascular accident and spine disorders did not meet their respective listings, *id.* at 43; (2) "the ALJ erred at every step of the disability analysis by failing to recognize [his] shoulder pain at all," *id.* at 54; and (3) the ALJ failed to weigh properly medical opinions in the record, including failing to grant Dr. Ferrand's opinions controlling weight or at least to explain why his assessment departed from Dr. Ferrand's, *id.* at 55–60.

Mr. Davenport also argues generally that the ALJ "failed to provide pinpoint citations for his evidence," *id.*; that his findings as to Mr. Davenport's mental status "are highly selective," *id.* at 44–48; and that his findings regarding Mr. Davenport's physical abilities failed to take into account evidence of physical impairment, *id.* at 49–54. "The ALJ lifted the few favorable statements from the report and ignored the rest. To construe templated phrases or relative, boilerplate medical descriptions without context is error." *Id.* at 52 (citing *Wagner v. Sec'y of Health & Human Servs.*, 906 F.2d 856, 857 (2d Cir. 1990)).

The Commissioner argues that, "[a]s the ALJ reasonably found, Plaintiff had a number of severe medical impairments during the relevant period, but the record did not fully support Plaintiff's allegations of total disability during that period." Gov't Mem. at 5. "Relying on the medical and non-medical evidence, including the opinions of the State agency reviewing psychological consultant, and other evidence of record, the ALJ reasonably found that Plaintiff, while limited, could perform a range of simple, repetitive, light work during the relevant period." *Id.* The Commissioner requests that the Court affirm her decision. *Id.* at 22.

Because there is no issue with the ALJ's analysis at Steps One and Two, the Court will evaluate Steps Three and Four of the disability determination process. The Court then will consider Step Five.

### A. Step Three—Listings

"At step three of the sequential evaluation, the ALJ must determine if, based on the medical evidence, the claimant suffers from an impairment listed in Appendix 1, referred to as a 'Listing.'" *Newell v. Colvin*, 15 Civ. 7095 (PKC) (DF), 2017 WL 1200911, at *3 (S.D.N.Y. Mar. 31, 2017) (citing *Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999)). "For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) (emphasis in the original) (citation omitted). "For a claimant to qualify for benefits by showing that his unlisted impairment, or combination of impairments, is 'equivalent' to a listed impairment, he must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment. *Id.* at 531 (emphasis in the original) (footnote and citation omitted).

Mr. Davenport argues that the ALJ "advanced th[e above] identical paragraph to explain why Davenport's severe cerebral vascular accident and spine disorders did not meet their respective listings." Pl.'s Mem. at 43.

> The ALJ found that these impairments were severe, yet the explanation as to why they did not meet or equal the listing is reduced to almost random statements about different impairments. Step three of the disability analysis here consists exclusively of a recitation of the rule followed by this paragraph. These impairments are very different medical problems that occurred at different points in time, had distinct physical manifestations and required different treatment, yet the same vague explanation was given for both medical conditions.

*Id.* Mr. Davenport argues further that "the part of paragraph [sic] resurfaced as the basis for assigning little weight to the treating source opinion—a mental health assessment," and that he "failed to provide pinpoint citations for his evidence." *Id.* at 43–44. "The ALJ's failure to give

sufficient information about the location of these MSE observations, prevents evaluation of the context or indeed the accuracy of his factual assertions." *Id.* at 44. Mr. Davenport contends that the ALJ's reliance on the paragraph above, without citations or sufficient detail about his findings as to each of the Listings considered, reflects the ALJ's selective reading of the record, cherry picking statements and ignoring medical assessments which, in Mr. Davenport's view, show that he is impaired. *Id.* at 44–54.

The Commissioner argues that "[t]he ALJ properly assessed the severity of Plaintiff's impairments and appropriately determined they did not meet the requirements of the Listings," finding that Mr. Davenport's "cerebral vascular accident, spine disorder, organic brain syndrome, depressive disorder, and anxiety disorder neither met nor medically equaled the severity of Listings 1.04 (disorders of the spine), Listing 11.04 (vascular insult to the brain), 12.02 (neurocognitive disorders), 12.04 (depressive, bipolar, and related disorders), and 12.06 (anxiety and obsessive-compulsive disorder)." Gov't Mem. at 6.

The Commissioner argues that "[t]he severity standards for listing-level impairments are very high," *id.* (citing *Sullivan*, 493 U.S. at 532 ("The [Commissioner] explicitly has set the medical criteria defining the listed impairments at a higher level of severity than the statutory standard. The listings define impairments that would prevent an adult, regardless of [her] age, education, or work experience, from performing any gainful activity, not just "substantial gainful activity.")), and that the ALJ properly made his determination based on a "fully developed [record] replete with the record is fully developed and replete with evidence demonstrating the inapplicability of Plaintiff's impairment with the severe standards of the Listings," *id.* at 12. Moreover, the Commissioner argues that Mr. Davenport "bears the burden showing that his

impairments met a Listing at step three," and that he has not done so. *Id.* (citing *Sullivan*, 493 U.S. at 530; *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 125 (2d Cir. 2012)).

Mr. Davenport does not argue that he meets any Listing requirements in particular but rather that the ALJ generally failed to justify his finding that Mr. Davenport did not meet any qualify for any Listing.

The Court will address each Listing considered by the ALJ in turn.

### 1. Listing 1.04—Disorders of the spine

To qualify under Listing 1.04, Plaintiff's spine disorder must result in compromise of a nerve root or the spinal cord, and be accompanied by at least one of the following:

> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);
>
> or
>
> B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours;
>
> or
>
> C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 C.F.R. § Pt. 404, Subpt. P, App'x 1 at § 1.04 ("Listing § 1.04").

The Commissioner argues that "substantial evidence supports the ALJ's determination that Plaintiff did not meet the criteria of Listing 1.04 because the record was absent of any

evidence demonstrating a compromised nerve root or any of the criteria in paragraphs A, B, or C, of Listing 1.04." Gov't Mem. at 7. Thus, the Commissioner argues, "the ALJ properly determined that Plaintiff's severe impairment did not meet Listing 1.04." *Id.*

The Court disagrees, but ultimately finds that the record could only lead to the conclusion that Mr. Davenport did not meet the criteria for Listing 1.04.

The Court cannot affirm "'administrative action on grounds different from those considered by the agency.'" *Burgess*, 537 F.3d at 128 (2d Cir. 2008) (quoting *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999)); *see also Perkins v. Berryhill*, No. 317-cv-200 (MPS), 2018 WL 3344227, at *3 (D. Conn. July 9, 2018) ("[E]ven if the Court could piece together from the record substantial evidence to support a finding that [the claimant] did not meet Listing 12.05C, remand would still be required."). "[W]here application of the correct legal principles to the record could lead to only one conclusion, [however], there is no need to require agency reconsideration." *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987); *compare Perkins*, 2018 WL 3344227, at *4 ("[T]he Court cannot conclude that application of Listing 12.05C to the evidence in the record could lead to only one conclusion, i.e., a finding of no disability, as the record contains some evidence that [the claimant] met the criteria for that listing."); *with Tilbe v. Astrue*, No. 5:10-CV-910 (NAM/ATB), 2012 WL 2930784, at *10 (N.D.N.Y. July 17, 2012) (finding "any error in the ALJ's failure to consider" a particular listing "harmless because no view of the evidence would support a finding that plaintiff's impairment met all the specified medical criteria" of that listing).

Listing 1.04 requires (A) "evidence of nerve root compression accompanied by sensory or reflex loss," *Sanders v. Comm'r of Soc. Sec.*, 506 F. App'x 74, 76 (2d Cir. 2012); (B) "spinal arachnoiditis manifested by severe burning or painful dysesthesia, resulting in the need for

changes in position or posture more than once every [two] hours," *Kenny v. Comm'r of Soc. Sec.*, No. 3:17-cv-01178 (JAM), 2018 WL 4562321, at *2 (D. Conn. Sept. 24, 2018), which must be confirmed "through an operative note, pathology report of tissue biopsy, or medically acceptable imaging," Listing § 1.04(B); or (C) "lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging," which cause "chronic nonradicular pain and weakness" and "result[] in inability to ambulate effectively, as defined in 1.00B2b," Listing § 1.04(C).

The ALJ determined that Mr. Davenport did not meet the criteria for Listing 1.04. *See* Tr. 31. His analysis consists wholly of the paragraph, noted by Plaintiff, which is used repeatedly as justification for multiple findings throughout the ALJ's decision. *Id.* He does not discuss the specific requirements of Listing 1.04 at all. This failure to engage in analysis of Listing 1.04's eligibility criteria as applied to Mr. Davenport's record constitutes legal error. *See Perkins*, 2018 WL 3344227, at *3 ("[E]ven if the Court could piece together from the record substantial evidence to support a finding that [the claimant] did not meet [a listing], remand would still be required. It is up to the ALJ to apply the criteria of [a] Listing [ ] in the first instance." (internal citation omitted)).

"[L]egal error alone [could] be enough to overturn the ALJ's decision." *Rousey v. Commissioner*, 285 F. Supp. 3d 723, 732 (S.D.N.Y. 2018) (internal citations and quotation marks omitted). Upon the Court's review of the record, however, Mr. Davenport has not met the eligibility criteria for Listing 1.04. There is no medical imaging or other medical evidence in the record showing that Mr. Davenport's nerve root or spinal cord was compromised. Thus, the evidence fails to fulfill the threshold requirement for eligibility under Listing 1.04. *See, Parsons v. Berryhill*, No. 3:17-cv-1550 (RMS), 2019 WL 1199392, at *6 n.6 (D. Conn. Mar. 14, 2019)

(noting that evidence of nerve root compression is a threshold criterion). Moreover, although some medical records show that he had lower back pain and at times showed an unstable gait, Tr. 414, 698, 722, 725, 877, the record evidence is insufficient to show that he met any of the other requirements under Listing 1.04.

Under Listing 1.04(A), "if there is involvement of the lower back" a claimant must present a "positive straight-leg raising test (sitting and supine)." Listing § 1.04(A). No such test is in the record here.

Under Listing 1.04(C), a claimant's pain and weakness must result in the inability to ambulate effectively as defined in Section 100B2b. Listing § 1.04(C). Under Section 100B2b, "[i]Inability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities." 20 C.F.R. § Pt. 404, Subpt. P, App. 1, § 100B2b ("Section 100B2b"). A claimant generally has "ineffective ambulation" where he cannot ambulate independently "without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities." *Id.*

> To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail.

*Id.* The record evidence shows that Mr. Davenport could consistently walk independently without the use of an assistive device: multiple clinicians documented observations and

assessments that Mr. Davenport could walk, albeit with some difficulty. *See, e.g.*, Tr. 404, 680, 682, 827, 855, 872, 998, 1074, 1093. He therefore has not shown an inability to walk effectively.

Furthermore, the records indicate that Mr. Davenport's back issues improved over time. For example, by November 2017, Mr. Davenport and his physical therapist, Ms. Bourassa, had decided to discharge his care for his back issues and to focus on his shoulder, after Mr. Davenport noted during several successive appointments that his back pain had lessened. Pl.'s Mem. at 53–54; Tr. 1085–88 (Hartford HealthCare, Hartford Hospital, Physical Therapy Daily Note (Nov. 7, 2017)).

Accordingly, Mr. Davenport has not shown, and there is no evidence in the record showing, that he meets the criteria to qualify under Listing 1.04. *See Burgess*, 537 F.3d at 128 ("The claimant . . . bears the burden of proving his or her case at steps one through four . . . ." (internal citations and quotation marks omitted)). The ALJ's failure to analyze properly the record regarding Mr. Davenport's eligibility under Listing 1.04 therefore constituted harmless error, and the Court will not remand as to the ALJ's determination of this issue. *Johnson*, 817 F.2d at 986 ("[W]here application of the correct legal principles to the record could lead to only one conclusion, there is no need to require agency reconsideration.").

### 2. Listing 11.04—Vascular insult to the brain

To qualify under Listing 11.04, a claimant must show:

A. Sensory or motor aphasia resulting in ineffective speech or communication (see 11.00E1) persisting for at least 3 consecutive months after the insult;

Or

B. Disorganization of motor function in two extremities (see 11.00D1), resulting in an extreme limitation (see 11.00D2) in the ability to stand up from a seated position, balance while standing or walking,

44

or use the upper extremities, persisting for at least 3 consecutive months after the insult;

Or

C. Marked limitation (see 11.00G2) in physical functioning (see 11.00G3a) and in one of the following areas of mental functioning, both persisting for at least 3 consecutive months after the insult:

    1. Understanding, remembering, or applying information (see 11.00G3b(i)); or
    2. Interacting with others (see 11.00G3b(ii)); or
    3. Concentrating, persisting, or maintaining pace (see 11.00G3b(iii)); or
    4. Adapting or managing oneself (see 11.00G3b(iv)).

20 C.F.R. § Pt. 404, Subpt. P, App. 1, § 11.04 ("Listing 11.04").

Once again, the ALJ determined that Mr. Davenport did not meet the criteria for Listing 11.04, based on an analysis consisting of the same identical paragraph. *See* Tr 31. He again does not discuss the specific requirements of Listing 11.04 at all. Again, the ALJ's failure to engage in analysis of Listing 11.04's eligibility criteria, as applied to Mr. Davenport's record, constitutes legal error. *See Perkins*, 2018 WL 3344227, at *3 ("[E]ven if the Court could piece together from the record substantial evidence to support a finding that [the claimant] did not meet [a listing], remand would still be required. It is up to the ALJ to apply the criteria of [a] Listing [ ] in the first instance." (internal citation omitted)).

Moreover, there is evidence in the record which could suggest that Mr. Davenport met the criteria for Listing 11.04—in particular, 11.04(C) "[m]arked limitation in physical functioning and in one of the following areas of mental functioning, both persisting for at least [three] consecutive months after the insult: [u]nderstanding, remembering, or applying information; [i]nteracting with others; [c]oncentrating, persisting, or maintaining pace; or [a]dapting or managing oneself." Listing 11.04.

As described above, Mr. Davenport had a stroke and underwent neurosurgery in November 2015. Tr. 324–26. On March 8, 2016, state consultive psychologist Philip Cardamone, PsyD, examined Mr. Davenport and administered cognitive testing upon request from Disability Determination Services, and he concluded that while Mr. Davenport "made substantial recovery" following his neurosurgery, he "ha[d] current problems that will probably hinder occupational functioning at this time." Tr. 362. Dr. Cardamone stated that Mr. Davenport had "returned to work after recovery from neurosurgery but found that he could not tolerate standing. He made some mistakes and was close to losing his balance. He stopped working after a few days after the shop owner informed him that he was a liability risk." Tr. 359.

On April 28, 2016, Mr. Davenport was seen for "transient right sided throbbing headaches lasting 2–3 minutes with severity of 5/10 that can happen intermittently every 2–3 hours," and he reported that "he zones out at times for no reason, he also cannot stand up too long as he falls on his left side." Tr. 404.

On October 5, 2016, APRN Taboada stated that Mr. Davenport had made outstanding progress neurologically. Tr. 414. In January 2017, Mr. Davenport was admitted to the hospital with headaches, and CT scans showed that he was "neurologically intact except for an inability to perform tandem gait." Tr. 877.

In the following months, various clinicians who saw Mr. Davenport noted that he appeared depressed and confused, sometimes not remembering his appointment times or the reasons he was prescribed certain medications. *See, e.g.*, Tr. 722, 891, 428, 432, 437, 725, 1073.

These included several assessments from Dr. Ferrand, who treated Mr. Davenport from May through November 2017. In May 2017, Dr. Ferrand noted that Mr. Davenport demonstrated a "mildly long response latency which was attributed to his stroke." Tr. 428. In June 2017, Dr.

Ferrand found that, "[o]n a cognitive screening measure [ ], he performed in the impaired range [ ], with deficits in visuospatial and executive functioning, short-term verbal memory, and attention." Tr. 432. In July 2017, Dr. Ferrand found that he "continue[d] to experience confusion and symptoms of depression and anxiety." Tr. 437. Later in July, Dr. Ferrand noted that Mr. Davenport's "boss w[ould] not let him come back to work part-time, despite his belief that he could manage it, without a note from his" doctor, and that he had "requested such a note from his [primary care provider] who reportedly felt uncomfortable endorsing [Mr. Davenport's] ability to work." Tr. 442. Dr. Ferrand discussed with Mr. Davenport that she was "supportive of [him] returning to work when it is medically safe to do so." *Id.* In August 2017, Mr. Davenport "report[ed] he has been struggling to socialize with friends and family as recommended, noting that he is not interested in leaving the house and is reluctant to communicate his concerns/ problems openly to others." Tr. 447. Mr. Davenport also he "recognize[d] that some of his cognitive limitations may make it difficult to work as a medical assistant." *Id.*

On August 7, 2017, Mr. Davenport reported to APRN Taboada that he was experiencing "ongoing headaches 4–5 times a week as well as short-term memory challenges." Tr. 727. Although APRN Taboada noted again that he had made good progress neurologically, Tr. 725, she referred him for "cognitive testing to assess his recent recall memory problems." Tr. 727.

On October 17, 2017, Mr. Davenport had an initial psychiatric evaluation with APRN Guerra, where he stated: "I don't know why I'm here." Tr. 1073. He also stated: "I remember my life[,] but recent things I have trouble remembering." *Id.*

On October 18, 2017, Mr. Davenport went to the emergency room for "chronic nonintractable headache, migraine and right shoulder pain." Tr. 951–1001. Overnight, he had CT scans which showed "[n]o acute brain abnormalities" or aneurysm, Tr. 999, but did show

"redemonstration of postsurgical changes following left occipital craniotomy and left cerebellar encephalomachia," Tr. 1040.

On November 19, 2017, Dr. Ferrand completed a medical assessment of Mr. Davenport, where she opined that approximately 21–25% of the time, Mr. Davenport's symptoms would interfere with the level of attention and concentration needed to perform even simple work tasks. Tr. 1195. She also wrote into the margin that Mr. Davenport "may lack the attention/ concentration needed to perform complex tasks." *Id.*

The ALJ failed to consider any of this evidence when determining whether Mr. Davenport qualified under Listing 11.04.

Accordingly, the Court will remand the Commissioner's decision for the ALJ to consider properly this evidence. *See Lorusso v. Saul*, No. 3:19-cv-126 (RMS), 2020 WL 813595, at *8 (D. Conn. Feb. 19, 2020) ("In light of the medical records, physician statements, and testimony suggesting a neurologic injury, the ALJ should have considered whether the plaintiff's impairments met the criteria for Listings 11.04 and 11.18."); *Perkins*, 2018 WL 3344227, at *3 ("[E]ven if the Court could piece together from the record substantial evidence to support a finding that [the claimant] did not meet [a listing], remand would still be required. It is up to the ALJ to apply the criteria of [a] Listing [ ] in the first instance." (internal citation omitted)).

### 3. Listings 12.02—Neurocognitive disorders; 12.04—Depressive, bipolar, and related disorders; and 12.06—Anxiety and obsessive-compulsive disorder

"Listings 12.02, . . . 12.04, [and] 12.06 . . . [each] have three paragraphs, designated A, B, and C." 20 C.F.R. § Pt. 404, Subpt. P, App'x 1, § 12.00(A)(2). Paragraph A of each listing includes medical criteria that must be present in medical evidence; Paragraph B contains functional criteria, "to evaluate how your mental disorder limits your functioning;" and Paragraph C contains criteris to evaluate whether a mental disorder is "serious and persistent."

*Id.* 20 C.F.R. § Pt. 404, Subpt. P, App'x 1, § 12.00(A)(2)(a)–(c). A claimant's alleged "mental disorder must satisfy the requirements of both paragraphs A and B, or the requirements of both paragraphs A and C." 20 C.F.R. § Pt. 404, Subpt. P, App'x 1, § 12.00(A)(2); *see also Douglass v. Astrue*, 496 F. App'x 154, 157 (2d Cir. 2012) ("Section 12 lists various mental impairments, and it generally requires claimants to demonstrate that they meet 'the diagnostic description in the introductory paragraph and the criteria of both paragraphs A and B . . . of the listed impairment.'").

### 1. Paragraph B Criteria

Listings 12.02, 12.04, and 12.06 have identical Paragraph B criteria[16]:

> Extreme limitation of one, or marked limitation of two, of the following areas of mental functioning:
>
> 1. Understand, remember, or apply information.
> 2. Interact with others.
> 3. Concentrate, persist, or maintain pace.
> 4. Adapt or manage oneself.

20 C.F.R. § Pt. 404, Subpt. P, App'x 1, §§ 12.02B ("Listing 12.02"), 12.04B ("Listing 12.04"), 12.06 ("Listing 12.06B"). A "marked limitation" means the claimant's "functioning in this area independently, appropriately, effectively, and on a sustained basis is seriously limited." 20 C.F.R. § Pt. 404, Subpt. P, App'x 1, § 12.00F2. An "extreme limitation" means the claimant is "not able to function in this area independently, appropriately, effectively, and on a sustained basis." *Id.*

---

[16] The Court uses Paragraph B criteria current as of January 17, 2017, because the ALJ issued his decision on February 28, 2018, after the effective date of the revised criteria. Revised Medical Criteria for Evaluating Mental Disorders, 81 FR 66138-01 (The Social Security Administration stating: "[T]hese final rules will be effective on January 17, 2017. . . . When the final rules become effective, we will apply them to new applications filed on or after the effective date of the rules, and to claims that are pending on or after the effective date.").

Understanding, remembering, or applying information "refers to the abilities to learn, recall, and use information to perform work activities." 20 C.F.R. § Pt. 404, Subpt. P, App'x 1, § 12.00E1. Examples include:

> Understanding and learning terms, instructions, procedures; following one- or two-step oral instructions to carry out a task; describing work activity to someone else; asking and answering questions and providing explanations; recognizing a mistake and correcting it; identifying and solving problems; sequencing multi-step activities; and using reason and judgment to make work-related decisions.

*Id.*

Interacting with others "refers to the abilities to relate to and work with supervisors, co-workers, and the public." 20 C.F.R. § Pt. 404, Subpt. P, App'x 1, § 12.00E2. Examples include:

> cooperating with others; asking for help when needed; handling conflicts with others; stating own point of view; initiating or sustaining conversation; understanding and responding to social cues (physical, verbal, emotional); responding to requests, suggestions, criticism, correction, and challenges; and keeping social interactions free of excessive irritability, sensitivity, argumentativeness, or suspiciousness.

*Id.*

Concentrating, persisting, or maintaining pace "refers to the abilities to focus attention on work activities and stay on task at a sustained rate." 20 C.F.R. § Pt. 404, Subpt. P, App'x 1, § 12.00E3. Examples include:

> Initiating and performing a task that you understand and know how to do; working at an appropriate and consistent pace; completing tasks in a timely manner; ignoring or avoiding distractions while working; changing activities or work settings without being disruptive; working close to or with others without interrupting or distracting them; sustaining an ordinary routine and regular attendance at work; and working a full day without needing more than the allotted number or length of rest periods during the day.

*Id.*

Adapting or managing oneself "refers to the abilities to regulate emotions, control behavior, and maintain well-being in a work setting. 20 C.F.R. § Pt. 404, Subpt. P, App'x 1, § 12.00E4. Examples include:

> Responding to demands; adapting to changes; managing your psychologically based symptoms; distinguishing between acceptable and unacceptable work performance; setting realistic goals; making plans for yourself independently of others; maintaining personal hygiene and attire appropriate to a work setting; and being aware of normal hazards and taking appropriate precautions.

*Id.*

The ALJ found that Mr. Davenport did not show marked or extreme limitation in any of these Paragraph B criteria, and therefore that he did not meet or medically equal the criteria of Listings 12.02, 12.04, or 12.06. Tr. 32.

The ALJ found that Mr. Davenprot had no limitation in understanding, remembering, or applying information, or in interacting with others. *Id.* He described Mr. Davenport as "consistently alert, fully oriented, well developed, well nourished, neat, casually dressed and groomed, cooperative, clean, and in no acute or clear distress," that "[i]n August of 2017, his mood and pain were better through treatment," and that his "speech, memory, attention, concentration, thought form, cognitive functioning, insight, and judgment were consistently normal and/or intact." *Id.* He also noted that Mr. Davenport could "shop by computer" and that he was "able to pay bills, count change, handle a savings account, and use a checkbook/money orders;" and that he "does not need to be reminded to go places or for someone to accompany him, and he has no problems getting along with family, friends, neighbors, or others." *Id.*

The ALJ found that Mr. Davenport had moderate limitation with regard to contentrating, persisting, or maintaining pace. The ALJ noted again that Mr. Davenport was "consistently alert,

fully oriented, well developed, well nourished, neat, casually dressed and groomed, cooperative, clean, and in no acute or clear distress," that "[i]n August of 2017, his mood and pain were better through treatment," and that his "speech, memory, attention, concentration, thought form, cognitive functioning, insight, and judgment were consistently normal and/or intact." *Id.* He also noted that Mr. Davenport could "shop by computer" and that he was "able to pay bills, count change, handle a savings account, and use a checkbook/money orders." *Id.*

The ALJ found that Mr. Davenport had no limitation in adapting or managing himself, noting that Mr. Davenport had "testified that he lives alone and that he has lived alone for eight years." *Id.* The ALJ observed that Mr. Davenport testified he "does not have any problems with caring for his hair, shave, and use the toilet [sic] and he does not need to be reminded to take care of his personal grooming or to take his medication." *Id.* Mr. Davenport

> can prepare frozen dinners for himself, [ ] he can clean, iron and do some laundry[,] and does not need help or encouragement to do these things. He tries to go outside for a walk at least four times a week and can walk and use public transportation and he can go out alone. [He] can shop by computer and he is able to pay bills, count change, handle a savings account, and use a checkbook/money orders. . . . [He] reachesout to friends and family approximately three to four times a week and goes to church regularly. . . . [He] has no problems with following written or spoken instructions and has no problems getting along with authority figures.

*Id.* 32–33.

The ALJ applied the correct Paragraph B criteria to evaluating Mr. Davenport under Section 12 Listings, so the Court finds no legal error.

The ALJ's decisions are also supported by substantial evidence in the record. *Halloran*, 362 F.3d at 31 ("Substantial evidence . . . . means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" (internal citation omitted)); *Brault*, 683 F.3d at 448 (This is a "very deferential standard of review—even more so than the 'clearly erroneous'

standard." (internal citation omitted)). His mental examinations largely showed normal cognition, thought content, thought process, perception, judgment, and insight. Tr. 434, 438, 443, 448, 453, 636, 1059, 1064, 1069, 1080, 1090, 1100, 1376. He was generally and consistently able to learn and carry out tasks, arriving at appointments on time and identifying his own mental and physical issues and potential solutions, *see, e.g.*, Tr. 428, 432, 442, 447, 452; interact with others, including his providers, friends, and family, free of excess irritability, *see, e.g.*, Tr. 94, 428–31; stay on task while he was working, except to the extent that he was limited by physical debilitation, *see, e.g.*, Tr. 429; and adapt and manage his own household and personal well-being, *see, e.g.*, Tr. 229–32. Consultative psychologist Dr. Cardamone reported that Mr. Davenport could understand instructions, and learn procedures, was capable of taking care of his personal needs, finances, and household, and was polite, friendly and cooperative. Tr. 362.

To the extent Mr. Davenport's objection to these findings relies on the ALJ's repetition of some of his findings with regard to each criterion, these objections do not warrant a remand. *Johnson*, 817 F.2d at 986 ("[W]here application of the correct legal principles to the record could lead to only one conclusion, there is no need to require agency reconsideration.").

Accordingly, even if there are deficiencies in the ALJ's analysis, the Court concludes that it was harmless error, as the record evidence does not show that Mr. Davenport's functioning independently, appropriately, effectively, and on a sustained basis in any of the Paragraph B criteria areas is seriously limited.

### 2. Paragraph C Criteria

Listings 12.02, 12.04, and 12.06 have identical Paragraph C criteria:

> Your mental disorder in this listing category is "serious and persistent;" that is, you have a medically documented history of the existence of the disorder over a period of at least 2 years, and there is evidence of both:

> 1.  Medical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s) that is ongoing and that diminishes the symptoms and signs of your mental disorder (see 12.00G2b); and
>
> 2.  Marginal adjustment, that is, you have minimal capacity to adapt to changes in your environment or to demands that are not already part of your daily life (see 12.00G2c).

Listing 12.02C; Listing 12.04C; Listing 12.06C.

The ALJ found that "the evidence fails to establish the presence of the '[P]aragraph C criteria, as [Mr. Davenport] has not experienced repeated episodes of decompensation, each of extended duration, does not have a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in his environment would be predicated to cause him to decompensate, and does not have a history of or current need for a highly supportive living arrangement." Tr. 33. The ALJ apparently applied the wrong version of Paragraph C criteria, since the Social Security Agency removed the requirement for "repeated episodes of decompensation" in its Revised Medical Criteria for Evaluating Mental Disorders that went into effect on January 17, 2017.[17]

The ALJ's failure to apply the correct Paragraph C standards to to Mr. Davenport's record constitutes legal error. *See Perkins*, 2018 WL 3344227, at *3 ("[E]ven if the Court could

---

[17] Revised Medical Criteria for Evaluating Mental Disorders, 81 FR 66138-01 (Sept. 26, 2016). Under "Sections 12.00G and 112.00G—What are the paragraph C criteria, and how do we use them to evaluate your mental disorder?," in response to comments, the Social Security Administration stated:

> [D]ecompensation . . . refers to a state of extreme deterioration, often leading to hospitalization." It also suggests that the person is a danger to him- or herself or others. That degree of impairment exceeds what we generally intend in the paragraph C criteria when we refer to the "marginal adjustment" that makes a person vulnerable to deterioration in functioning. Furthermore, we also believe that continuing to use "decompensation" may result in confusion between the prior rules and these final rules. In these final rules, we no longer require "repeated episodes of decompensation, each of extended duration.

*Id.* (internal citations omitted).

piece together from the record substantial evidence to support a finding that [the claimant] did not meet [a listing], remand would still be required. It is up to the ALJ to apply the criteria of [a] Listing [ ] in the first instance." (internal citation omitted)); *Ellington*, 641 F. Supp. 2d at 328 ("[L]egal error alone can be enough to overturn the ALJ's decision." (citing *Johnson*, 817 F.2d 983, 985 (2d Cir.1987)).

Accordingly, the Court will remand the Commissioner's decision that Mr. Davenport did not meet the criteria for Listings 12.02, 12.04, or 12.06, for the ALJ to analyze whether Mr. Davenport met Paragraph C criteria under the current proper standard, and whether he met Paragraph A criteria for any of these Listings.

### B. Step Four—Residual Functional Capacity

If a claimant's impairments do not meet the criteria for a Listing at Step Three, Step Four requires "the Secretary to ascertain the claimant's residual functional capacity," *Pellam v. Astrue*, 508 F. App'x 87, 89 (2d Cir. 2013) (internal quotation marks and alterations omitted); or "the most [a claimant] can still do despite [his] limitations." 20 C.F.R. § 404.1545(a)(1). In assessing a claimant's residual functional capacity, an ALJ must follow a two-step process:

> At the first step, the ALJ must decide whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged. . . . If the claimant does suffer from such an impairment, at the second step, the ALJ must consider the extent to which the claimant's symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence of record.

*Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (internal quotation marks and alterations omitted) (citing 20 C.F.R. § 404.1529). An ALJ must assess a claimant's residual functional capacity "based on all the relevant evidence in [his] case record." 20 C.F.R. § 404.1545(a)(1).

Applying the required two-step process, the ALJ found that Mr. Davenport "has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b)," with some limitations. Tr. 33. With regard to limitations on Mr. Davenport's functioning, the ALJ stated that "whenever statements are not substantiated by objective medical evidence, I must consider other evidence in the record to determine if the claimant's symptoms limit [his] ability to do work-related activities." *Id.* He found that while Mr. Davenport's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," his "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." Tr. 34–35.

Mr. Davenport argues that the ALJ's decision as to his residual functional capacity is not supported by substantial evidence because (1) the ALJ failed to take into account multiple treating source reports, Pl.'s Mem. at 55–56; and (2) the ALJ failed to follow the treating phsycian rule and improperly weighted various treating providers' reports, *id.* at 56–60. He argues that the ALJ's RFC finding is based only "on the record, [Dr.] Carlson's MRFC and Davenport's statements about his functioning." *Id.* at 55. He also argues that the ALJ here engaged in the same "cherry picking" practice which resulted in his reversal by another court in this district. *Id.* at 44 (citing *White v. Berryhill*, No. 3:17-cv-01310 (JCH), 2018 WL 2926284, at *4 (D. Conn. June 11, 2018) (remanding a decision by ALJ Bonsangue, noting that he had cherry picked the consultative examiner opinions on which he relied)).

The Commissioner argues that substantial evidence does support the ALJ's decision, and that "it is not enough for Plaintiff to merely disagree with the ALJ's weighing of the evidence or to argue that the evidence in the record could support his position; he must show that no reasonable factfinder could have reached the ALJ's conclusions on this record." Gov't Mem. at

12 (citing *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012)). In the Commissioner's view, the medical evidence in the record—in particular, treatment notes and clinical findings from Dr. Davis, APRN Taboada, Dr. Esmende, and physical therapist Bourassa—"supports the ALJ's conclusion that Plaintiff's physical impairments would not preclude him from performing light work with additional limitations to standing/walking for four hours with a sit/stand option at will, no climbing ladders, ropes, or scaffolds, and no exposure to moving mechanical parts and unprotected heights." *Id.* at 13–15. The Commissioner points to reports from Dr. Ferrand, Dr. Cardamone, and Dr. Carlson on Mr. Davenport's mental status, arguing that their assessments showed that, "at a minimum, Plaintiff was capable of performing simple, routine, and repetitive tasks, with no strict time or production quotas." *Id.* at 15–16. The Commissioner argues that the ALJ appropriately considered the medical opinions of record and properly applied the treating physician rule. *Id.* at 16–21.

The Court disagrees.

### 1. Treating Physician Rule

The treating physician rule gives "deference to the views of the physician who has engaged in the primary treatment of the claimant." *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003). Under this rule, "the opinion of a claimant's treating physician as to the nature and severity of the impairment is given 'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'" *Burgess*, 537 F.3d at 128 (quoting 20 C.F.R. § 404.1527(d)(2)); *see also Greek v. Colvin*, 802 F.3d 370, 375 (2d Cir. 2015) (same (internal citations omitted)).[18]

---

[18] On March 27, 2017, new regulations took effect that effectively eliminate the treating physician rule; for claims filed before March 27, 2017, however—like Mr. Davenport's—the treating physician rule continues to apply. *See* 20

The treating physician's opinion is not afforded controlling weight, however, where "the treating physician issued opinions that are not consistent with other substantial evidence in the record, such as the opinions of other medical experts." *Halloran*, 362 F.3d at 32. Where an ALJ does not assign "controlling weight" to a treating physician's opinion, they must "consider certain factors to determine how much weight to give it, and should articulate 'good reasons' for the weight given." *See Camille v. Colvin*, 652 F. App'x 25, 27 (2d Cir. 2016) (citing *Halloran*, 362 F.3d at 32); *Schisler v. Sullivan*, 3 F.3d 563, 568 (2d Cir. 1998) (requiring an ALJ to "provide a claimant reasons when rejecting a treating source's opinion"); *Schrack v. Astrue*, 608 F. Supp. 2d 297, 301 (D. Conn. 2009) ("The regulations further provide that even if controlling weight is not given to the opinions of the treating physician, the ALJ may still assign some weight to those views, and must specifically explain the weight that is actually given to the opinion."). Failure to provide "'good reasons' for not crediting the opinion of a claimant's treating physician" can be a basis for remand. *Burgess*, 537 F.3d at 129–30 (quoting *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999)).

Additionally, "an ALJ cannot reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record." *Rosa*, 168 F.3d at 79. "[I]f an ALJ perceives inconsistencies in a treating physician's reports, the ALJ bears an affirmative duty to seek out more information from the treating physician and to develop the administrative record accordingly." *Id.* (quoting *Hartnett v. Apfel*, 21 F. Supp. 2d 217, 221 (E.D.N.Y. 1998)).

"[T]o override the opinion of the treating physician," the ALJ must consider, under the relevant regulations, factors including "(1) the frequently [sic], length, nature, and extent of

C.F.R. § 416.927; *Smith v. Comm'r of Soc. Sec. Admin.*, 731 F. App'x 28, 30 n.1 (2d Cir. 2018) ("The Social Security Administration revised its medical source regulations in 2017, but the new regulations apply only to claims filed on or after March 27, 2017." (citing *Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 Fed. Reg. 5,844 (Jan. 18, 2017))).

treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Selian v. Astrue*, 708 F.3d 409, 418 (2d Cir. 2013) (citing *Burgess*, 537 F.3d at 129). "'An ALJ does not have to explicitly walk through these factors, so long as the Court can conclude that the ALJ applied the substance of the treating physician rule[.]'" *London v. Comm'r of Soc. Sec.*, 339 F. Supp. 3d 96, 102 (W.D.N.Y. 2018) (quoting *Scitney v. Colvin*, 41 F. Supp. 3d 289, 301 (W.D.N.Y. 2014)). The ALJ "must 'comprehensively set forth [his] reasons for the weight assigned to a treating physician's opinion.'" *Burgess*, 537 F.3d at 129 (quoting *Halloran*, 362 F. 3d at 33 and citing 20 C.F.R. § 404.1527(d)(2)).

The ALJ discussed opinions of Dr. Cardamone, a psychologist; Ms. Caruso, a licensed clinical social worker; Dr. Ferrand, a psychologist; Dr. Coughlin, and Dr. Connolly, state medical consultants; Dr. Kleinman, a state psychological consultant; and Dr. Carlson. Tr. 38–40. He gave "great weight" to Dr. Carlson's opinion, noting that "she specializes in psychology, and her opinion is consistent with the medical evidence of record," Tr. 40; and "little weight" to all the others, stating repeatedly that their opinions were "inconsistent with the medical evidence of record," and citing the phrase that Mr. Davenport "was consistently alert, fully oriented, well developed, well nourished, neat, casually dressed and groomed, cooperative, clean, and in no acute or clear distress." Tr. 38–39.

Furthermore, while the ALJ discussed notes and records provided by Mr. Davenport's other treating treating sources, he did not articulate what weight he assigned to any of their medical opinions. These treating sources included Dr. Davis, a physician; Patricia Uhl, a physical therapist; Ms. Taboada, an APRN; Dr. Esmende, a physician; Ms. Bourassa, a physical

therapist; Dr. Codispoti, a physician; and Mr. Guerra, an APRN. Dr. Davis, APRN Taboada, and physical therapist Bourassa, in particular, treated Mr. Davenport multiple times.

The treating physician rule extends to opinions by licensed psychologists. *See Perez v. Colvin*, No. 3:13-cv-868 (HBF), 2014 WL 4852836, at *26 (D. Conn. Apr. 17, 2014) (noting that opinions by licensed psychologists are "acceptable sources of medical information"), *report and recommendation adopted*, No. 3:13-cv-868 (JCH), 2014 WL 4852848 (D. Conn. Sept. 29, 2014); 20 C.F.R. § 404.1502(a)(2) (listing "licensed psychologist" as an acceptable medical source).

Dr. Carlson rendered her assessment on June 21, 2016, based only on the records submitted as part of Mr. Davenport's request for reconsideration of his initial application. Tr. 121–22. All of these records preceded Mr. Davenport's car accident in May 2016. *Id.* There is no evidence that Dr. Carlson ever personally examined Mr. Davenport. By contrast, many of the clinicians whose opinions the ALJ assigns "little weight," or about whose opinions the ALJ did not discuss weight given, treated Mr. Davenport personally multiple times. In particular, the ALJ failed to explain why he did not give controlling weight to Dr. Ferrand's opinion.

As a licensed psychologist, Dr. Ferrand qualifies as a "medically acceptable" source. She personally treated Mr. Davenport nine times between May and November 2017, Tr. 428–31, 432–36, 437–41, 442–46, 447–52, 1058, 1063–67, 1068–72, 1190–97, and she completed a medical assessment of Mr. Davenport in November 2017, Tr. 1190–97. Dr. Ferrand therefore is a treating physician for Mr. Davenport whose opinion is entitled to controlling weight. As a result, the ALJ must either grant her opinion controlling weight or articulate "good reasons" for not doing so. *Halloran*, 362 F.3d at 32 ("Commissioner must provide a claimant with 'good reasons' for the lack of weight attributed to a treating physician's opinion).

In June 2017, Dr. Ferrand found that Mr. Davenport "endorsed clinically significant symptoms of depression [ ] and anxiety [ ], placing him in the 'severe' range." Tr. 432. In July 2017, she stated that she was "supportive of [Mr. Davenport] returning to work when it is medically safe to do so." Tr. 442. In August 2017, Dr. Ferrand wrote that she had discussed with Mr. Davenport "the potential to rehabilitate injuries to the point where a return to work would be safe and satisfying." Tr. 447. She later opined in the November 2017 medical assessment that Mr. Davenport would be unable to work for twelve months or more. Tr. 1192.

"Because the treating physician has the 'opportunity to develop an informed opinion as to the physical status of a patient' over the course of treatment, the treating physician's opinion is 'so much more reliable than that of an examining physician who sees the claimant once and performs the same tests and studies as the treating physician.'" *Moreau v. Berryhill*, No. 3:17-cv-00396 (JCH), 2018 WL 1316197, at *8 (D. Conn. Mar. 14, 2018) (internal citations omitted)). Courts therefore have remanded social security cases where the ALJ relies heavily on a state consultant who only saw a claimant once, rather than on a treating source opinion. *See, e.g.*, *id.*; *Downes v. Colvin*, No. 14-CV-7147 JLC, 2015 WL 4481088, at *14 (S.D.N.Y. July 22, 2015) (remanding where the "consultative assessments . . . on which the ALJ relied, were based on a single examination conducted more than a year after the alleged onset of [claimant's] disability"); *Sanchez v. Colvin*, No. 13 CIV. 6303 PAE, 2015 WL 736102, at *6 (S.D.N.Y. Feb. 20, 2015); (remanding where "the consulting physicians who examined [the claimant] did so just once (both on the same day)"); *cf. La Torre v. Colvin*, No. 14 CIV. 3615 AJP, 2015 WL 321881, at *6 n.2 (S.D.N.Y. Jan. 26, 2015) (acknowledging that the ALJ gave no weight to a state consultant's "evaluation of [claimant's] medical records because as a single decision maker that consultant is not an acceptable medical source within the meaning of 20 CFR 404 .1513(d) and

20 C.F.R 416.913(d) and is thus unable to establish or comment as to the existence of a medically determinable impairment or any related functional limitations" (internal citations and quotation marks omitted)).

Here, where the only clinician whose weight is granted "great weight" never examined the claimant at all and based her assessment on a fraction of the medical evidence before the ALJ, there is nothing in this record to support so heavily discounting the opinions of Mr. Davenport's various treating physicians. His stated reasoning that the treating clinicians' opinions were inconsistent with other medical records appears to reflect the ALJ's selective reading of the evidence. The record indeed contains evidence that either Mr. Davenport's psychological symptoms or his back and shoulder issues could have resulted in a finding of a more reduced residual functional capacity. The record shows that his depressive symptoms were severe enough to culminate in suicide ideation and a suicide attempt, that Mr. Davenport had difficulty socializing, and that he had ongoing memory and confusion issues. Mr. Davenport indeed reported to Dr. Ferrand that his boss had recently asked him to take time off from his job as a hairstylist after showing him "video evidence of concerning work behaviors, including swaying on his feet and irritable behavior toward customers." Tr. 429. Mr. Davenport stated that he was unaware of these behaviors but agreed to take time off. *Id.*

Additionally, as discussed in the section below, there is evidence in the record suggesting that Mr. Davenport's back and later shoulder issues made basic tasks difficult, if not impossible.

Notably, Ms. Bourassa treated Mr. Davenport in physical therapy eight times between April and October 2017. Tr. 888–95, 937–40, 1160–63, 1164–67, 1168–71, 1172–75, 1176–85, 1185–88. In April 2017, she found that Mr. Davenport's "[f]unctional limitations include[d] all prolonged tasks such as standing, walking, lifting and carrying" and that he was "unable to

perform work tasks." Tr. 891. In October 2017, she found that Mr. Davenport "continue[d] to be challenged with core strengthening," "progressive hip strengthening," and "with all flexibility tasks," and that he "demonstrate[d] difficulties with maintaining core activation with hip hinging tasks." Tr. 1169. She found later in October that his "[f]unctional limitations include[d] prolonged sitting, walking[,] reaching[,] and cleaning tasks." Tr. 1777.

The ALJ did not discuss any of this evidence when explaining why he discredited Dr. Ferrand's opinion or the other treating source opinions. Crucially, this evidence belies the ALJ's repeated statement that Dr. Ferrand's and other opinions were "inconsistent with the medical evidence of record."

Although, in general, courts "defer to the Commissioner's resolution of conflicting evidence," *Cage*, 692 F.3d at 122, an ALJ must articulate "good reasons" for the weight given the different treating source opinions, *Camille*, 652 F. App'x at 27. Failure to provide "'good reasons' for not crediting the opinion of a claimant's treating physician" can be a basis for remand. *Burgess*, 537 F.3d at 129–30 (quoting *Snell*, 177 F.3d at 133). The ALJ must give a treating physician's opinion deference where it is not inconsistent "with other substantial evidence in the record, such as the opinions of other medical experts." *Halloran*, 362 F.3d at 32. The ALJ cannot rely solely on repetitive, selective, "cherry-picked" evidence in the record as a benchmark to find that treating source opinions are inconsistent with medical evidence in the record.

As in *White v. Berryhill*, the "ALJ's cherry picking of the evidence [here] led to an incomplete and slanted summary, which he then used as a benchmark against which to evaluate the treating source opinions." 2018 WL 2926284, at *4. The ALJ's decision therefore will be remanded for proper application of the treating physician rule.

## 2. Incomplete review of the record

The ALJ apparently did not evaluate the impact of Mr. Davenport's shoulder pain, which is evidenced repeatedly in the record, at all. Yet, the record contains evidence that Mr. Davenport began experiencing serious pain and limited functioning in his right arm and shoulder immediately following his car accident in May 2016, followed by consistent low back pain and constriction for months, with shoulder pain resurfacing by September 2017.

Dr. Davis noted on the day he was admitted to the hospital in May 2016 that Mr. Davenport's "right upper extremity ha[d] pain about the right forearm," and that he had "pain about the right side." Tr. 364.

In September 2017, Mr. Davenport reported to Dr. Ferrand that "he [wa]s feeling better physically, with the exception of worsening shoulder pain which ha[d] limited his right arm movement and ability to push or pull things," describing "the pain as a 6–7 on a 10 point scale but not[ing] it is sporadic with only certain activities." Tr. 1068. Mr. Davenport "agree[d] to present to urgent care immediately following [their] appointment, to have his arm/shoulder evaluated." *Id.*

On September 26, 2017, Mr. Davenport reported "feeling better in his back" to his physical therapist Ms. Bourassa, but said that "his shoulder was a little sore and he would like to try PT for that next." Tr. 1164.

On October 10, 2017, Mr. Davenport reported to Ms. Bourassa that his "back felt really good after last time but my shoulder has been worse." Tr. 1172–75 He "note[d] that he [wa]s still having trouble with his shoulder and therefore avoided arm movements . . . ." Tr. 1173.

On October 18, 2017, Mr. Davenport went to the emergency room for "chronic nonintractable headache, migraine and right shoulder pain," Tr. 951, where a physician found

that he had "mild decreased strength in the right upper extremity compared to left upper extremity," and a neurologist found that he had diminished motor function in his right finger, wrist, elbow, and shoulder, due to pain," Tr. 998. The neurologist noted further that Mr. Davenport reported having been to an urgent clinic for right shoulder pain, and that an x-ray taken by the urgent clinic showed no fractures. Tr. 996. The urgent clinic "suspected his pain was musculoskeletal in etiology due to rotator cuff injury" and "document[ed] limitations in his movement secondary to pain." *Id.* Mr. Davenport said he "fe[lt] like his bone [wa]s being pulled out of his [shoulder] socket." Tr. 998.

On October 24, 2017, Mr. Davenport saw Ms. Bourassa again for physical therapy, reporting that "he noticed an increase[] in shoulder pain and discomfort and by association had worsening back stiffness and heaviness in the L lumbar." Tr. 1177. She found that his "[f]unctional limitations include[d] prolonged sitting, walking[,] reaching[,] and cleaning tasks." Tr. 1177.

On November 7, 2017, Mr. Davenport reported again to Ms. Bourassa that "his shoulder pain ha[d] worsened and that he would like to transition to care for his shoulder and discharge the back case." Tr. 1186.

On November 19, 2017, Dr. Ferrand noted that Mr. Davenport had current pain in his back with left-sided weakness and "[n]ewer pain symptoms in [his right] shoulder," and that he could not lift his arm. Tr. 1192.

On November 29, 2017, at his hearing before the ALJ, Mr. Davenport could only raise his right hand about six inches off the table. Tr. 77. He stated, in response to his attorney's questions, that he was "having problems with his right shoulder" which made it "very painful"

for him to use his right arm and hand. *Id.* He stated that he did not know yet what the problem was, but that he had an appointment with a specialist coming up. Tr. 77–78.

The ALJ is required to evaluate all the evidence in the record when determining the residual functional capacity of a claimant. 20 C.F.R. § 404.1545(a)(1).

"The fundamental deficiency involved with 'cherry picking' is that it suggests a serious misreading of evidence, or failure to comply with the requirement that all evidence be taken into account, or both." *See Dowling v. Comm'r of Soc. Sec.*, No. 5:14-CV-0786 (GTS/ESH), 2015 WL 5512408, at *11 (N.D.N.Y. Sept. 15, 2015).

Accordingly, the Commissioner's decision will be remanded for the ALJ to re-evaluate Mr. Davenport's residual functional capacity based on the full record, including Mr. Davenport's shoulder debilitation.

## C. Step Five—Other Work in the National Economy

After a claimant has proved that his or her residual functional capacity precludes a return to past relevant work, Step Five shifts the burden to the Commissioner "to show there is other work that [the claimant] can perform." *Brault*, 683 F.3d at 445. The ALJ must determine whether the claimant can do "other work existing in significant numbers in the national economy" based on the claimant's residual functional capacity. *Greek*, 802 F.3d 373 n.2 (citing 20 C.F.R. §§ 404.1520(g), 404.1560(b)). Sufficient "[w]ork exists in the national economy when there is a significant number of jobs (in one or more occupations) having requirements which [the claimant is] able to meet with [her] physical or mental abilities and vocational qualifications." 20 C.F.R. § 416.966 (b). The Commissioner cannot meet his burden when there are only "[i]solated jobs that exist only in very limited numbers in relatively few locations outside of the region where" the claimant lives. 20 C.F.R. § 416.966 (b).

The ALJ may make this determination "either by applying the Medical Vocational Guidelines or by adducing testimony of a vocational expert." *McIntyre*, 758 F.3d at 151. *Calabrese v. Astrue*, 358 F. App'x 724, 276 (2d Cir. 2009) (summary order) (internal citations omitted).

ALJ Bonsangue here relied heavily on vocational expert, Edmond Calandra, in making his determination at Step Five. Tr. 40–41. The ALJ found that Mr. Davenport's ability to perform "light work" "has been impeded by additional limitations." Tr. 41. To determine whether those limitations rendered Mr. Davenport unable to work, the ALJ relied on the vocational expert's testimony. *Id.* Mr. Calandra testified at Mr. Davenport's hearing that given Mr. Davenport's "age, education, work experience, and residual functional capacity," and with some adjustments to job requirements such as having a sit/stand option and reducing time and production quotas, Mr. Davenport "would be able to perform the requirements of representative occupations such as" Solderer (50,000 jobs nationally), Gluer (40,000 jobs nationally), and Assembler (400,000 jobs nationally). *Id.*

"An ALJ may rely on a vocational expert's testimony regarding a hypothetical as long as the facts of the hypothetical are based on substantial evidence, and accurately reflect the limitations and capabilities of the claimant involved." *Id.* "[F]or the testimony of a vocational expert to be considered reliable, the hypothetical posed must include all of the claimant's functional limitations, both physical and mental supported by the record." *Harbock v. Barnhart*, 210 F. Supp. 2d 125, 134 (D. Conn. 2002) (citation omitted). And "an ALJ's hypothetical should explicitly incorporate any limitations in concentration, persistence, and pace." *McIntyre*, 758 F.3d at 152. When the ALJ "asks the vocational expert a hypothetical question that fails to include or otherwise implicitly account for all of the claimant's impairments, then the vocational

expert's testimony is not substantial evidence and cannot support the ALJ's conclusion that the claimant can perform significant numbers of jobs in the national economy." *Hernandez v. Berryhill*, No. 3:17-cv-368 (SRU), 2018 WL 1532609, at *18 (D. Conn. 2018) (internal quotation marks and citation omitted).

At Mr. Davenport's hearing, the ALJ asked Mr. Calandra to consider a hypothetical individual with Mr. Davenprt's age and education, who is limited to the light exertional level. Tr. 98, 100. The ALJ stated that this individual "should never be required to climb any ropes, ladders or scaffolds, . . . should avoid moving mechanical parts all together and unprotected heights," and "is limited to performing only simple, routine and repetitive tasks, which he can do for two-hour increments throughout an eight-hour day as long as there's no strict adherence to any time or production quotas." Tr. The ALJ added that "The individual is limited to standing and walking a total of four hours in one day, and for that would also need a sit/stand option at will while remaining on task." Tr. 100. He asked Mr. Calandra if there were any unskilled jobs at the light exertional level that this individual could perform. *Id.*

Mr. Calandra responded that this hypothetical individual could perform the unskilled, light exertion jobs of a solderer, gluer, or assembler. *Id.* He stated that the Dictionary of Occupational Titles (DOT) does not discuss whether sit/stand options are available in those jobs. *Id.* The ALJ then asked whether, in Mr. Calandra's experience, individuals in these jobs could perform them with a sit/stand option and no more than four hours of standing or walking in a day, and Mr. Calandra responded that yes, they could. *Id.*

In continued response to the ALJ's follow up questions, however, Mr. Calandra testified that if an individual's fatigue or pain caused him to be unable to sit and focus for more than ten minutes at a time on a consistent basis, that it would preclude even work at the unskilled level.

Tr. 100–01. He testified further that if an individual, even at the simple, routine level, has to keep asking a supervisor to remind him about tasks or procedure past the first few days on the job, that individual will not be able to sustain employment at the unskilled level. Tr. 101.

Mr. Davenport's counsel then asked Mr. Calandra whether, "if someone were limited to only occasional use of their right-dominant hand," that person could do any of the jobs Mr. Calandra had previously outlined. Tr. 101. He responded that no, that person could not. Mr. Calandra stated further that "there would be just one sedentary occupation, unskilled occupation, that [he] could offer": a security surveillance monitor, of which there are 3,000 jobs nationally. Tr. 102. Even at this level, Mr. Calandra stated that the job's tolerance for the individual being off-task would be 5% at the most. Tr. 103.

The ALJ's reconsideration of Mr. Davenport's residual functional capacity at Step Four will implicate the findings at Step Five. As the Court has explained, the ALJ failed to properly apply the treating physician rule and failed to evaluate all the evidence in the record. In particular, the ALJ did not adequately consider all the record evidence regarding Mr. Davenport's shoulder limitations or psychological capacity. More specifically, as to Step Five, the ALJ's hypothetical as presented to Mr. Calandra did not account for medical evidence, discussed above, regarding Mr. Davenport's psychological limitations or shoulder issues. It is especially evident from the hearing transcript that the ALJ discounted consideration of Mr. Davenport's shoulder debilitation, given that he based his determination at Step Five on a hypothetical that did not include any right arm or shoulder issues, and he did not discuss those issues at all in his Step Five analysis.

The ALJ cannot rely on the vocational expert's testimony based on a hypothetical that did not account for all relevant evidence. *See Hernandez*, 2018 WL 1532609, at *18 (When the ALJ

"asks the vocational expert a hypothetical question that fails to include or otherwise implicitly account for all of the claimant's impairments, then the vocational expert's testimony is not substantial evidence and cannot support the ALJ's conclusion that the claimant can perform significant numbers of jobs in the national economy." (internal quotation marks and citation omitted)). Indeed, the hearing transcript itself suggests that the ALJ might have found Mr. Davenport disabled if he had considered the evidence regarding his shoulder in particular, since Mr. Calandra's opinion changed once the hypothetical was altered to include arm limitations.

Accordingly, the ALJ's decision also will be remanded for reconsideration of Step Five.

## IV. CONCLUSION

For the reasons explained above, Mr. Davenport's motion for to reverse the decision of the Commissioner is **GRANTED in part and DENIED in part**.

His motion is granted with respect to the Commissioner's determination at Step Three of his eligibility under Listing 11.04, 12.02, 12.04, and 12.06, but denied with respect to the determination of his eligibility under Listing 1.04; and granted with respect to the Commissioner's determination at Step Four, regarding Mr. Davenport's residual functional capacity, for determination based on the full record including evidence of Mr. Davenport's shoulder debilitation and with proper application of the treating physician rule; and granted with respect to the Commissioner's determination at Step Five.

Accordingly, consistent with this ruling, the Commissioner's motion also is **GRANTED in part and DENIED in part.**

The decision of the Commissioner therefore is **VACATED** and **REMANDED** for rehearing and further proceedings in accordance with this Ruling and Order.

The Clerk of the Court is respectfully directed to change the defendant of the case from Ms. Berryhill to Mr. Saul.

The Clerk of the Court also is respectfully directed to enter judgment for Mr. Davenport, remand this case to the Commissioner for rehearing and further proceedings in accordance with this Ruling and Order, and close this case.

The Clerk of the Court is further instructed that, if any party appeals to this Court the decision made after the remand, any subsequent Social Security appeal is to be assigned to the undersigned judge.

**SO ORDERED** at Bridgeport, Connecticut, this 31st day of March, 2020.

         /s/ Victor A. Bolden        
Victor A. Bolden
United States District Judge